Argued and submitted May 30, affirmed July 21, 1980

STATE OF OREGON,
*Respondent,*

*v.*

NATHAN EUGENE DARNALL,
*Appellant.*

(No. J77-1634, CA 15666)

614 P2d 120

J. Marvin Kuhn, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Karen H. Green, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James M. Brown, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Richardson, Judges.

THORNTON, J.

## THORNTON, J.

Defendant appeals from his conviction, after jury trial, for the murder of his father. He makes the following assignments of error:

1) The court erred in not suppressing defendant's signed statement admitting his role in the crime because the evidence failed to establish that defendant had effectively waived his *Miranda* rights[1] and because defendant on several occasions was denied the chance to contact his attorney.

2) The court erred in not granting defendant's motion for change of venue.

3) The court erred in not granting a directed verdict that defendant was not guilty as a matter of law by reason of a mental disease or defect which prevented him from conforming his conduct to the law.

The state's theory was that defendant had commissioned a friend of his, David Wright, to kill defendant's father, a druggist, in order to collect money from his father's estate and from several life insurance policies on the victim's life. In return for committing the crime, defendant's friend was to receive a percentage of defendant's share in the estate.

The murder occurred in July, 1976, in Drain, Oregon. About a year later defendant was arrested at Wright's home in Dekalb, Georgia, where he was residing, on a charge of auto theft. The interrogation which led to the statement which defendant seeks to suppress took place at the Dekalb County (Georgia) Police Department. Defendant waived extradition and was returned to Douglas County, Oregon, for trial.

The substance of defendant's defense was as follows: Defendant's father had allegedly become involved in supplying drugs illegally to people to whom

---

[1] *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974 (1966).

he owed a substantial amount of money. Over a period of years, the father had attempted to extricate himself from this situation but was unable to do so. There was constant pressure to continue deliveries, some of which was directed at defendant in order to coerce his father's compliance. Eventually, defendant's father became so disheartened that he concluded that the only way to terminate this involvement was to have himself killed and permit defendant to collect his life insurance and discharge the debt. Accordingly, he importuned defendant to make the necessary arrangements, insisting it was the only way. Defendant testified that his father's pleas finally caused him to accede to the demands.

## SUPPRESSION OF CONFESSION

■     After defendant was arrested in Georgia, he was taken to the local police headquarters where he was held in an interview room for approximately six hours. From the time he was arrested, he was read his *Miranda* rights a total of four times and signed three waiver of rights cards, acknowledging that his rights had been read to him and that he understood and waived them. He was interviewed by several officers concerning this crime and the auto theft with which he had originally been charged. These officers testified that defendant was cooperative in making the statement, that he orally indicated he understood his rights, and that he never asked to see an attorney. No threats or promises were made.

Defendant, on the other hand, testified that he did not believe that in signing the cards he was waiving his *Miranda* rights and that he asked to be allowed to call his attorney on several occasions and was told that he would have to wait until later after the interviews were complete. His testimony also suggested that the officers had intentionally misled him in several instances as to the significance of the waiver cards and, by having defendant initial supposed

changes in the wording of the statement, had created the impression that defendant had read the statement before signing, contrary to defendant's contention.

The trial court denied the motion to suppress, stating:

> "The testimony of three Oregon and one Georgia policemen [sic] is diametrically opposed to that of the Defendant. In determining where the truth lies in contradictory testimony the manner in which the witnesses testify and the interest of the witnesses in the outcome must necessarily be considered. The court has been impressed with the testimony of the officers who are well trained and experienced. Some of Defendant's testimony simply does not square with any rational interpretation of the usual conduct of trained police officers."

The court found that defendant was properly advised of his rights. We are bound by that finding. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). After examining the record, we concur that defendant knowingly and intelligently waived his *Miranda* rights. *State v. Warner,* 284 Or 147, 156, 585 P2d 681 (1978).

CHANGE OF VENUE

■ Defendant moved for a change of venue pursuant to ORS 131.355, alleging that the press coverage and the nature of the crime created such a prejudicial impact on potential jurors in Douglas County that a fair trial was impossible in that jurisdiction.[2] Such motions are addressed to the sound discretion of the trial court and will not be overturned by this court except for an abuse of that discretion. *State v. Wampler,* 30 Or App 931, 934, 569 P2d 46 (1977), *rev den* 281 Or 99 (1978), *cert den* 436 US 960 (1979).

■ Defendant's evidence consisted of newspaper accounts from several papers in Douglas County as

---

[2] "The court, upon motion of the defendant, shall order the place of trial to be changed to another county if the court is satisfied that there exists in the county where the action is commenced so great a prejudice against the defendant that he cannot obtain a fair and impartial trial." ORS 131.355.

well as similar reports in other news media. He also offered affidavits from six attorneys stating that, in their opinion, defendant could not obtain an impartial trial. The trial court found that there was nothing in the material which made it appear that defendant had committed the crime and denied the motion, granting leave to renew the motion at the time the jury was selected if it appeared at that time that a suitably impartial panel could not be assembled. That motion was not renewed. We have reviewed the record, including the transcript of the *voir dire* of prospective jurors, and conclude that there was no abuse of discretion in denying the motion.

## DIRECTED VERDICT ON MENTAL DISEASE OR DEFECT.

At trial the defendant admitted his part in the crime but pled not guilty by reason of mental disease or defect. ORS 161.295. The psychiatric testimony by defendant's three experts indicated that defendant suffers from a severe form of neurosis called "alternating multiple personality." Such a condition is characterized by sudden changes (called "dissociations") in personality structure, generally occurring during periods of great stress. The condition comes about when the primary personality (the first to develop after birth), confronted with stressful situations, is no longer able to resolve conflicting emotional urges, needs and associated guilt feelings, and, consequently, "splits" off certain traits, embodying them in one or more secondary personalities. The secondary personalities are generally aware of the primary personality (referring to it in the third person), but the primary personality is not aware of the existence of the others, experiencing instead periods of amnesia. Defendant's experts all agreed that defendant was a true multiple personality.

In defendant's case, his primary personality (called "Ned") was very weak, ineffectual and highly dependent upon his father. In order to protect himself

from the consequences of this weakness, defendant developed a second personality ("Nathan") who was very aggressive and who would "come out" and take charge when "Ned" was subjected to more emotional stress than he could handle. One of defendant's experts stated that, during his examination of defendant, a third personality surfaced ("Nate") who is very affable and seemingly well-balanced. At one point during defendant's testimony, he "dissociated" from "Ned" to "Nathan." The change in defendant's vocabulary, diction, confidence and memory, judging from the transcript alone, is remarkable.

As mentioned earlier, defendant contends that his only motive was to pay off his father's "creditors" with the money he received from the estate, and that "Ned" had no choice but to acquiesce in his father's demands. According to defendant's experts, such a reaction on defendant's part was consistent with his multiple personality. They stated that the "Ned" personality had been overborne by his father's appeals because of the intimate and strongly dependent relationship between the two. "Nathan," although stronger willed than "Ned," was powerless to prevent the act because "Nathan's" function was not to pass judgment on "Ned's" actions, but merely to protect "Ned" from his own weakness. All three experts opined that, while "Ned" could appreciate the criminality of his actions, he could not conform his conduct to the law under the circumstances.

■■ It is possible that proof of a mental disease or defect can be so overwhelming that a trial court could find a defendant not responsible for his actions as a matter of law. *State v. Sands,* 10 Or App 438, 439, 499 P2d 821, *rev den* (1972). The question is whether there is evidence in the record to raise an issue as to whether defendant was indeed responsible. We believe there was such evidence in this case.

■ First, the jury could have disbelieved the testimony of defendant's experts. *State v. Sands, supra,*

[167]

10 Or App at 440. The state's two experts were of the opinion that an alternating multiple personality was not necessarily a mental disease or defect which would preclude responsibility. One expert was of the opinion that defendant had some knowledge of psychology and could have feigned his condition. He pointed to several things in defendant's conduct and history which he felt were inconsistent with a true multiple personality. There was evidence that defendant, who had been placed under hypnosis by one of his own experts, may have been subtly encouraged to invent certain of the "pressures" which he claimed caused him to carry out the crime. Defendant's experts admitted that, even if defendant's condition was as claimed, the defense hinged on the jury's believing that pressures were in fact brought to bear on defendant. Much of the evidence of such pressures came from defendant himself. Under the circumstances, we conclude that this evidence was sufficient to create a jury question as to defendant's responsibility and the directed verdict was properly denied.

Affirmed.