STATE OF HAWAII, Plaintiff-Appellant, *v.* RODRIGO RODRIGUES, Defendant-Appellee

NO. 8865

(CRIMINAL NO. 53619)

MARCH 8, 1984

LUM, C.J., NAKAMURA, PADGETT, HAYASHI AND WAKATSUKI, JJ.

OPINION OF THE COURT BY HAYASHI, J.

This is an appeal by the State of Hawaii from a judgment of acquittal granted by Judge Huddy under Hawaii Revised Statutes

(HRS) § 704-408. Appellant claims, and we agree, that there was sufficient evidence presented so as to require the judge to present the issue of sanity to the jury.[1] We also decide that a defense of multiple personality syndrome (MPS) does not per se require a finding of acquittal.

Defendant was indicted on November 20, 1979, on three counts of sodomy in the first degree (HRS § 707-733(1)(a)(i)) and one count of rape in the first degree (HRS § 707-730(1)(a)(i)). His victims were all young girls, whom he would lure into secluded areas. He filed a notice of intention to rely on the defense of mental disease, disorder or defect under HRS § 704-404(1) on March 12, 1980. Defendant had previously been examined by Vadim P. Kondratief, M.D. in California, who referred defendant to Bernauer W. Newton, Ph.D., also in California, both of whom testified for the defense.

On March 17, 1980, the court pursuant to HRS § 704-404(2), ordered further mental examination of the defendant to be performed by three court appointed psychiatrists: Drs. Creighton U. Mattoon, Emily Khaw and Gene Altman.

On October 16, 1980, the defendant filed a motion for judgment of acquittal. Hearings on that motion and a motion for closure of the hearings were held intermittently beginning December 1, 1980. On December 2, the court consolidated the hearing on the motion for acquittal with a motion for determination of fitness to proceed.

On January 9, 1981, the judge found defendant unable to assist in his defense, and pursuant to HRS § 704-406 suspended the proceedings, deferring the matter of acquittal.

For the next year and a half, State psychiatrist Dr. Morgan treated defendant at Hawaii State Hospital in Kaneohe, and on June 25, 1982, the defendant was brought back into court. The defendant was presented as fit to proceed, so the court renewed hearings on the motion for the judgment of acquittal. On August 27, 1982, the judge granted the motion, and this appeal followed.

---

[1] HRS § 704-408 was amended by the legislature in 1980 to require the court to submit the issue of criminal responsibility to the jury or trier of fact at the trial of the charges against the defendant. The amendment does not apply to this case, however, since it does not apply to any crime which occurred prior to June 7, 1980.

## I.

In every criminal case there exists a presumption that a defendant is sane. This presumption can be overcome by evidence to the contrary, and then the State has the burden of proving a defendant's sanity beyond a reasonable doubt. *State v. Valentine,* 1 Haw. App. 1, 612 P.2d 117 (1980).

The defendant in the case at hand introduced testimony from five psychiatrists to rebut the presumption of sanity. There was no contention that this was not sufficient to rebut the presumption. Accordingly, the burden of proof shifted to the State to prove, beyond a reasonable doubt, that appellant was sane at the time of the offenses.

The testimony introduced by the defense addressed the fact that under HRS § 704-408, a defendant will be relieved of criminal responsibility if at the time of the alleged conduct the defendant suffered from a mental disease, disorder, or defect which substantially impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. In support of his motion for acquittal, the defendant raised the defense that at the time of the offense he was suffering from multiple personality syndrome, which should exclude his responsibility for his actions.

Multiple personality syndrome (MPS) is a disorder where there are within one individual, two or more distinct personalities, each of which is dominant at a particular time. Each individual personality is complex and integrated with its own behavior pattern and the personality that is dominant at any particular time determines the individual's behavior. Often there is amnesia on the part of one personality for the existence of the other.[2]

The defense of MPS was raised in connection with HRS § 704-408 because one personality often cannot control the actions of another personality. This disorder is extremely rare, and has recently come to the attention of several courts. The trend in these courts is toward examining the sanity of each personality presented

---

[2] French and Shechmeister, *The Multiple Personality Syndrome and Criminal Defense,* 11 AM. ACAD. PSYCH. & L. BULL. 1 at 17-25 (1983).

in an individual, or at least the personality which allegedly committed the offense.

> The law adjudges criminal liability of the person according to the person's state of mind at the time of the act; we will not begin to parcel criminal accountability out among the various inhabitants of the mind.

*Kirkland v. State,* 166 Ga. App. 478, 304 S.E.2d 561, 564 (1983). Recent cases dealing with the multiple personality defense have held that it is immaterial whether the defendant was in one state of consciousness or another, so long as in the personality then controlling the behavior, the defendant was conscious and his or her actions were a product of his or her own volition. *State v. Darnall,* 47 Or. App. 161, 614 P.2d 120 (1980); *State v. Grimsley,* 3 Ohio App. 3d 265, 444 N.E.2d 1071 (1982); and *Kirkland, supra.*

The cases dealing with MPS can be examined in a similar fashion as other defenses of insanity. If a lunatic has lucid intervals of understanding he shall answer for what he does in those intervals as if he had no deficiency. The law governs criminal accountability where at the time of the wrongful act the person had the mental capacity to distinguish between right and wrong or to conform his conduct to the requirements of the law. Since each personality may or may not be criminally responsible for its acts, each one must be examined under the American Law Institute (ALI)-Model Penal Code (MPC) competency test. *See State v. Nuetzel,* 61 Haw. 531, 606 P.2d 920 (1980); and *Kirkland, supra.*

## II.

Before we examine the testimony relating to the competency of the alleged personalities of the defendant elicited from the psychiatrists, we must address defendant's claim that the court erred in not striking the testimony of one of the psychiatrists, Dr. Khaw.

Generally, in determining whether the conclusions or opinions of an expert witness are admissible, the court must exercise a large measure of discretion with which an appellate court is reluctant to interfere unless that discretion has been manifestly abused to the prejudice of the complaining party. *State v. Torres,* 60 Haw. 271, 589 P.2d 83 (1978); 31 AM. JUR. 2D *Expert and Opinion Evidence* § 3.

The determination of qualification is in the first instance for the court, and is discretionary. But qualifications also go to weight, and Hawaii Rules of Evidence (HRE) Rule 702.1, expressly provides for cross-examination on this subject. *See, State v. Okura,* 56 Haw. 455, 541 P.2d 9 (1975).

The standard of review therefore, is whether the court abused its discretion in failing to strike the testimony. Defendant argues, and we agree, that the qualifications and methodology of the doctor had been seriously called into question, and we also agree that the trial court gave little, if any weight to Dr. Khaw's testimony.

Court: I'll find her qualified as a psychiatrist, and in that capacity, with expertise to render diagnosis and treatment of people who may or may not be affected with a mendal [sic] disorder, which includes multiple personality. But it's always for the trier of fact to weigh and evaluate the opinion of any expert, and the trier of fact may accept or reject it. So the question is again to the weight and effect for trier of fact to give to the testimony.

Tr. 1/6/81 at 49. But we disagree with defendant's contention that:

[h]ad Defendant's motion (to strike Dr. Khaw's testimony) been granted, the court below would have been entirely without any evidence or inferences required to be drawn therefrom pursuant to *State v. Freitas, supra,* and *State v. Summers, supra,* other than the exensive [sic] evidence of insanity and lack of penal responsibility adduced by Defendant. On that state of the record, the judgment of acquittal below would have been compelled.

Defendant's Answering Brief at 30. Defendant has failed to show a clear abuse of discretion or any resulting prejudice from the introduction of the testimony, because as will be noted below, the question of acquittal was one for the jury or trier of fact, who could have given Dr. Khaw's testimony the weight it deserved. There was also other evidence elicited from the other psychiatrists which could support an inference that defendant was sane.

### III.

An examination of the testimony of the psychiatrists reveals that few of the experts agreed as to any of their opinions.

Dr. Kondratief, the first to examine the defendant, had not

treated nor diagnosed anyone who had MPS, and had only seen two or three cases of MPS. Before he referred the defendant to Dr. Newton, he had formed a diagnosis that the defendant was suffering from fugue, temporary amnesia or MPS. After discussing the matter with Dr. Newton, he formed a final diagnosis of MPS. His opinion was that defendant as a whole lacked substantial capacity to appreciate the wrongfulness of his conduct and also lacked substantial capacity to control his conduct to the requirements of the law. He testified that personality A had no control or knowledge of personality B. He also testified that B was not capable of understanding the proceedings against him, but never expressed his opinions as to whether A or B could control their actions or appreciate the wrongfulness of their conduct as separate personalities.

Dr. Newton treated the defendant through hypnosis, and prepared tapes of his sessions which allegedly showed defendant's several personalities. He had diagnosed seventeen cases of MPS and had treated eleven patients for MPS, and stated that the defendant as a whole was capable of appreciating the wrongfulness of his conduct, but was not capable of conforming his conduct to the requirements of the law. He stated that personality A understood the charges against him and could conform his behavior to the requirements of the law. He testified that defendant was in the B state when he committed the acts, and that B could appreciate the wrongfulness of his acts but could not conform his behavior to the requirements of the law.

Dr. Altman, one of the court appointed psychiatrists, had never treated or diagnosed any cases of MPS. After viewing a summary tape prepared by Dr. Newton, and discussing the case with Dr. Newton, he came to his diagnosis that defendant suffered from MPS. He stated that personality B had committed the offenses, that B knew that what he was doing was wrong, and that B had some degree of volitional control over his actions.

Dr. Khaw, another court appointed psychiatrist, had never treated nor diagnosed nor even seen a case of MPS. After viewing the summary tape prepared by Dr. Newton, she still claimed to never have seen a case of MPS. Her diagnosis was that defendant's mental condition was sexual perversion, pedophilia. She stated that defendant knew what was wrong and could conform his behavior

to the requirements of the law, although it was difficult for him to do so.

Dr. Mattoon, the last of the court appointed psychiatrists, testified that he had never diagnosed, treated, nor seen anyone with MPS. He diagnosed defendant as having MPS after talking with Dr. Newton for four hours in the court halls before testifying. He stated that both A and B could understand that the acts were wrong, but that it did not matter to B. He testified that A could control himself to the requirements of the law, as could B, and that it was B who performed the acts.

Finally Dr. Morgan, who had treated six cases of MPS, stated that he wasn't sure that the defendant had MPS until after he began treating him. (Dr. Morgan had testified earlier that defendant had MPS, but after treating the defendant he testified that during his earlier testimony he actually was unsure of whether defendant had MPS.) After treating him for approximately six hundred hours, Dr. Morgan came to the conclusion that defendant had in fact three personalities: personality A, named Rod, was defendant's normal waking state; personality B, named David, emerged at age sixteen and was the mediating personality between Rod and the final personality; the last personality's name was Lucifer, who emerged at age three, and who had taken over at the times of the offenses. Dr. Morgan testified that the defendant as a whole lacked the capacity to appreciate the wrongfulness of his conduct and to conform his behavior to the requirements of the law. He testified that A and B knew that the acts were wrong but that C did not care whether they were right or wrong and that A and B had the capacity to conform their conduct to the requirements of the law but C did not care about his conduct or the consequences.

A summary of the testimony of all the psychiatrists reveals that: defendant had anywhere from one to three personalities; A could appreciate the wrongfulness of his acts and conform his behavior to the requirement of the law, but could not control B; B could understand the wrongfulness of his conduct but could or could not (depending on whose testimony was more persuasive) control his behavior to the requirements of the law; and C did not care whether what he did was right or wrong or about the consequences of his conduct. Dr. Khaw, theorizing there was one personality,

testified A committed the acts; four doctors theorizing there were two personalities, testified B committed the acts; and Dr. Morgan testified that C executed the crimes.

## IV.

In light of the above testimony, we find merit to the appellant's claim that the judge erred in granting the acquittal without giving the matter to the jury. The standard of review on appeal is that it is a jury question unless a reasonably minded jury viewing the facts and inferences in a light most favorable to the prosecution would necessarily possess a reasonable doubt as to defendant's sanity. *State v. Nuetzel,* 61 Haw. 531, 606 P.2d 920 (1980). *State v. Freitas,* 62 Haw. 17, 608 P.2d 408 (1980), held that where the evidence is such that a jury might fairly have or not have a reasonable doubt as to defendant's sanity, the issue becomes a question of fact for the jury, and a motion for judgment of acquittal will be denied. The testimony in this matter is disjointed and:

> [w]hat psychiatrists may consider a mental disease or defect for medical purposes where clinical treatment is the main concern may not be the same as mental disease or defect for the jury's purpose where an accused's criminal responsibility is at issue.

*State v. Nuetzel,* 61 Haw. at 543, 606 P.2d at 928. The expert may testify as to mental states, but they are not competent to render an opinion as to the impact of the mental state on legal accountability. This is a question for the jury where, as here, there are divers opinions as to which personality performed the acts and whether that personality was sane or not.

The purpose of expert testimony is to assist the trier of fact on matters not of common knowledge, where the witnesses have knowledge, training and experience enabling them to form a better opinion on a given state of facts than that formed by those not so well equipped. 31 AM. JUR. 2D *Expert Opinion and Testimony* § 16. The jury is entitled to know the facts on which an expert bases his opinion in order to make its own assessment of the expert's opinion and the reliability of the diagnostic and analytical process employed. *State v. Summers,* 62 Haw. 325, 614 P.2d 925 (1980).

> It is well settled that we are not bound by expert testimony as to the sanity or mental state of an accused, even where it is undis-

puted, but the fact finder may reject it out of hand.
*Kirkland, supra,* at 565; *see also, Bachran v. Morishige,* 52 Haw. 61, 469 P.2d 808 (1970). Since the jury may reject an expert's testimony, it would appear axiomatic that they could reject part of the testimony of an expert. Thus they could accept one psychiatrist's testimony as to whether a defendant could appreciate the wrongfulness of his actions, and accept another psychiatrist's testimony regarding the capability of the defendant to conform his conduct to the requirements of the law. They could therefore arrive at a conclusion conjectured by no one expert alone.

### V.

It also appears in this case, that the trial judge improperly weighed the testimony of the doctors, and acted as a trier of fact rather than a judge on the motion for acquittal.

> The Court: The only question that the Court had in that regard was Dr. Khaw's testimony. But in review of her testimony, giving full weight and effect to her testimony, the Court placed some emphasis on her testimony to the effect that she believed that it was very, very hard for the defendant to control his conduct or to conform his conduct to the requirements of law. She used phrases such as "very, very hard." "I think he can." "Difficult." And, when the Court weighs that testimony along with the testimony of Dr. Newton and the other doctors who have testified, the Court has reached the conclusion that necessarily a judgment of acquittal is required in this case.

Tr. 8/27/82 at 60-61.

> The Court: The impact, the effect of the weight of the testimony is for the trier of facts.

* * * * *

The Court: I can weigh it.
Tr. 12/16/80 at 54. The weighing of testimony is reserved for the jury or trier of fact unless no reasonable juror could disagree as to an outcome. *State v. Summers, supra.* The sanity issue before this court and the role of the jury was discussed in *Nuetzel.*

> The jury, as the trier of facts, remains the sole sentinel in the protection of both the rights of the accused and the welfare of society, enabled finally to consider all relevant facts pertaining

to the defendant's state of mind at the time the act was committed, and being thereby better qualified to render its ultimate moral judgment under the law.

*State v. Nuetzel,* 61 Haw. at 543, 606 P.2d at 928. The judge acted improperly in granting the motion for acquittal in this case.

We hold therefore, that the question of defendant's sanity at the time of the offense and the corresponding question of which personality was present at the time of the offense were questions properly for the jury or the trier of fact.

## VI.

While defense counsel at oral argument conceded that this court probably had jurisdiction under HRS § 641-13(2) to hear this case because no jury had been impanelled, we feel it necessary to discuss the issue of double jeopardy.

Under HRS § 641-13(2), an appeal may be taken by and on behalf of the State "from an order or judgment, sustaining a special plea in bar, or dismissing a criminal case where the defendant has not been put in jeopardy." Double jeopardy does not attach unless there is a risk of a determination of guilt. *Serfass v. United States,* 420 U.S. 377, 95 S. Ct. 1055, 43 L. Ed. 2d 265 (1974). In *State v. Hagerud,* 174 Mont. 361, 570 P.2d 1131 (1977), defendant was acquitted by reason of mental defect excluding responsibility in a pretrial evidentiary hearing to determine whether defendant at the time of the offense charged was so clearly unable to appreciate the criminality of his conduct or conform his conduct to the requirements of the law that trial would be useless. On appeal, the court held that the defendant was never once put in jeopardy as he was never subjected to the possibility of conviction of the crime charged and, thus, to permit the State to obtain review of the district court's decision acquitting defendant did not put defendant in double jeopardy in violation of his constitutional rights.

Hawaii case law has recognized two inquiries which must be made to determine whether double jeopardy has attached. The first is to determine when jeopardy attaches, and the second is to determine if, on the facts of the case, a retrial is barred by the double jeopardy clause. *State v. Miyazaki,* 64 Haw. 611, 645 P.2d 1340 (1982). Here no jeopardy attached. This was a pretrial motion

to determine whether defendant at the time of the offense charged was unable to appreciate the wrongfulness of his conduct or to control his conduct to the requirements of the law. There was no possibility of a conviction, and thus a trial is not barred by the double jeopardy clause of the Fifth Amendment.

Accordingly, the decision of the lower court is vacated and the case remanded for further proceedings consistent with this opinion.

*Arthur E. Ross (Ernest J. Freitas, Jr.* on the reply brief), Deputy Prosecuting Attorneys, for plaintiff-appellant.

*John S. Edmunds (Ronald J. Verga,* with him on the brief; *John S. Edmunds,* A Law Corporation, of counsel) for defendant-appellee.

## DISSENTING OPINION OF NAKAMURA, J., WITH WHOM WAKATSUKI, J., JOINS

The court, on an appeal brought by the State, vacates a judgment of acquittal entered by the circuit court and remands the case for a redetermination of criminal responsibility. In my opinion the decision is unprecedented, unauthorized, and unconstitutional.

### I.

After his indictment by the Grand Jury on three counts of sodomy and one count of rape, the defendant gave notice in accord with Hawaii Revised Statutes (HRS) § 704-404(1)[1] of an "intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility" and moved for a mental examination. Thereupon, the proceedings against him were suspended,

---

[1] HRS § 704-404(1) reads:

Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt his fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution. If a trial jury has· been empanelled, it shall be discharged or retained at the discretion of the court. The dismissal of the trial jury shall not be a bar to further prosecution.

and the circuit court appointed two psychiatrists and a psychologist to examine the defendant. Although the three examiners initially found the defendant's capacity to understand the proceedings and assist in his own defense as well as his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law were unimpaired, two of them subsequently submitted amended reports indicating the presence of an impairing mental disorder.

Relying on these reports, the defendant asserted he could not be held responsible for the criminal acts charged and moved the court for a judgment of acquittal pursuant to HRS § 704-408.[2] At the hearing on the motion, testimony supporting the claim of insanity was adduced from the members of the court-appointed panel of examiners who earlier found substantial impairment in defendant's capacity to appreciate the criminal nature of his conduct and from several other psychiatrists and psychologists. On the first day of the hearing on the motion to acquit, however, defense counsel also requested a determination of defendant's "capacity to understand the proceedings against him or to assist in his own defense."[3] The hearing on this motion was consolidated with that already in progress, with the understanding that the court's ruling on defendant's fitness to proceed would be rendered prior to its

---

[2] Prior to its amendment in 1980, HRS § 704-408 read as follows:

Determination of irresponsibility. If the report of the examiners filed pursuant to section 704-404 states that the defendant at the time of the conduct alleged suffered from a physical or mental disease, disorder, or defect which substantially impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, and the court, after a hearing if a hearing is requested, is satisfied that such impairment was sufficient to exclude responsibility, the court, on motion of the defendant, shall enter judgment of acquittal on the ground of physical or mental disease, disorder, or defect excluding responsibility.

The foregoing provisions are applicable to this case since the offenses alleged in the indictment occurred in 1978 and 1979 and the amendatory act expressly provided that the amendment would not apply to any offenses occurring before its approval. *See* S.L.H. 1980, c. 222, § 3.

[3] HRS § 704-403 provides that:

[n]o person who as a result of a physical or mental disease, disorder, or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures.

consideration of the issues related to criminal responsibility.

After hearing the parties out on the question of defendant's fitness for trial, the circuit court decided he was then incompetent to proceed; it further found he posed a substantial danger to others in his mental state. Consequently, proceedings were suspended, and defendant was committed to the custody of the State Director of Health "for detention, care, and treatment for so long as such unfitness . . . [should] endure."[4]

Subsequently, when the circuit court was convinced that defendant's competency to stand trial had been restored, the hearing on the motion for acquittal was resumed.[5] After listening to additional testimony on the issue of criminal responsibility and being satisfied that the defendant's mental impairment when the offenses were committed "was sufficient to exclude responsibility," the circuit court entered a judgment of acquittal pursuant to HRS § 704-408.[6] *See* note 2 *supra*. The State's appeal to this court followed.

---

[4] The commitment was pursuant to HRS § 704-406(1), which in relevant part provides:

If the court determines that the defendant lacks fitness to proceed, the proceeding against him shall be suspended, except as provided in section 704-407, and the court shall commit him to the custody of the director of health to be placed in an appropriate institution for detention, care, and treatment for so long as such unfitness shall endure.

[5] HRS § 704-406(2) in relevant part provides:

When the court, on its own motion or upon the application of the director of health, the prosecuting attorney, or the defendant, determines, after a hearing if a hearing is requested, that the defendant has regained fitness to proceed, the penal proceeding shall be resumed.

[6] The defendant, however, was not released from custody. He has remained in the custody of the State Director of Health under the court's order entered pursuant to HRS § 704-411(1), which in pertinent part reads:

When a defendant is acquitted on the ground of physical or mental disease, disorder, or defect excluding responsibility, the court shall, on the basis of the report made pursuant to section 704-404, if uncontested, or the medical evidence given at the trial or at a separate hearing, make an order as follows:

(a) The court shall order him to be committed to the custody of the director of health to be placed in an appropriate institution for custody, care, and treatment if the court finds that the defendant presents a risk of danger to himself or the person or property of others and that he is not a proper subject for conditional release . . . .

## II.

"Save in certain instances ..., the State has no appeal in a criminal case unless the defendants are convicted," *Peters v. Jamieson,* 48 Haw. 247, 256, 397 P.2d 575, 582 (1964); and save in a certain instance not applicable here,[7] "[r]ulings prejudicial to the State and leading to an acquittal are never reviewed." *Id.* Thus, despite the defendant's concession "that this court probably had jurisdiction under HRS § 641-13(2) to hear this case," the pertinent inquiry at the very outset must be whether an appeal lies.[8] I would say it does not.

The statute authorizing appeals by the State in criminal cases confers a right of appeal "in a limited number of enumerated instances," but "does not include in its enumeration a judgment of acquittal." *State v. Shintaku,* 64 Haw. 307, 310, 640 P.2d 289, 292 (1982). Claiming the appeal is actually from an order sustaining a special plea in bar, the State purports to seek review on the strength of HRS § 641-13(2) which sanctions an appeal "[f]rom an order or judgment, sustaining a special plea in bar, or dismissing the case where the defendant has not been put in jeopardy." But "[t]he availability of appellate review sought by the State in a criminal case can be based only on clear statutory authority," *State v. Johnson,* 50 Haw. 525, 526, 445 P.2d 36, 37 (1968), and "[s]tatutes granting the State the right of appeal in criminal cases must be strictly construed. They are not to be enlarged by construction and cannot be extended beyond their plain terms." *Territory v. Balarosa,* 34 Haw. 662, 665-66 (1938); *see also State v. Shintaku,* 64 Haw. at 310-11, 640 P.2d at 292.

HRS § 641-13(2) sanctions an appeal from an order sustaining "a special plea in bar." At common law, such a plea "was ordinarily

---

[7] HRS § 641-13 was amended in 1982 to authorize an appeal by the State from "a judgment of acquittal following a jury verdict of guilty." *See* S.L.H. 1982, c. 81, § 1.

[8] "The objection for want of jurisdiction, if it exists, may be raised by answer or at any subsequent stage of the proceedings and may be raised for the first time on appeal. It may, as a matter of fact, be raised by the court of its own motion." Territory v. Correa, 24 Haw. 165, 166-67 (1917). For it is fundamental that "parties cannot by waiver confer jurisdiction over the subject matter upon the court." Tong On v. Tai Kee, 11 Haw. 424, 427 (1898).

used to raise three defenses — *autrefois acquit, autrefois convict,* and pardon." *United States v. Sisson,* 399 U.S. 267, 300 n.53 (1970) (emphasis in original). We have said it "ordinarily presents some matter extrinsic of the record which completely bars the proceeding, such . . . as a plea of insanity,[9] a plea of pardon, or a plea of former acquittal, conviction or jeopardy. . . ." *State v. Johnson,* 50 Haw. at 526, 445 P.2d at 37, quoting *Territory v. Anderson,* 25 Haw. 55, 58 (1919). But as the Supreme Court points out, "there is no warrant for its use to single out for determination in advance of trial matters of defense either on questions of law or fact." *United States v. Murdock,* 284 U.S. 141, 151 (1931). *Cf. United States v. Sisson,* 399 U.S. at 301 ("a motion in bar cannot be granted on the basis of facts that would necessarily be tried with the general issue in the case.").

What was presented in support of the motion to acquit was hardly "some matter extrinsic of the record." What the court heard and evaluated was evidence of defendant's mental impairment that covered "matters of defense . . . on questions of law or fact." "Compelled as we are to strictly construe HRS § 641-13," *State v. Shintaku,* 64 Haw. at 310-11, 640 P.2d at 292, there is no warrant for reading "a special plea in bar" expansively to cover a motion for acquittal premised on a mental disorder sufficient to exclude criminal responsibility. Though the majority finds no cause to address the obvious discrepancy between a plea in bar and a motion to acquit, the significant difference between the two divests this court of jurisdiction to consider the State's appeal.

### III.

Proceeding with the appeal, nonetheless, the majority finds the defendant has yet to be put in jeopardy, and concludes a reversal of

---

[9] A plea of insanity that would present "some matters extrinsic of the record" and would be a plea in bar is a motion to determine fitness to proceed. A hearing thereon would not be to determine responsibility for the charged offense; it would only cover the defendant's fitness to stand trial. A determination of unfitness in this regard would constitute a *bar* to proceedings, since "[i]t has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." Drope v. Missouri, 420 U.S. 162, 171 (1975); *see also* State v. Raitz, 63 Haw. 64, 67, 621 P.2d 352, 356 (1980).

the circuit court and a remand of the case for a redetermination of criminal responsibility would not run afoul of constitutional commands. The record, however, cannot sustain the finding, and a rerun of the hearing on mental impairment would transgress the cardinal rules of double jeopardy jurisprudence.

A.

"Jeopardy denotes risk. In the constitutional sense, jeopardy describes the risk that is traditionally associated with criminal prosecution." *Breed v. Jones,* 421 U.S. 519, 528 (1975). The majority accepts the State's thesis that the defendant has not been in jeopardy even though he moved for acquittal on a ground that he was deranged when the criminal acts were committed and evidence in support of and in opposition to the motion was adduced. It assumes the "pre-trial motion" did not expose the defendant to a risk of conviction since the circuit court was not empowered to enter a judgment of conviction pursuant to HRS § 704-408.[10] Yet in fact, the defendant was in jeopardy when he sought acquittal and brought forth evidence on an essential element of the crimes charged in the indictment.

"Implicit in a motion for judgment of acquittal by reason of mental irresponsibility is the admission that the defendant committed the offense charged." *State v. Lee,* 61 Haw. 313, 314, 602 P.2d 944, 946 (1979). Here, what may have been implicit was rendered explicit by evidence submitted in support of the plea for acquittal. The testimony and the opinions of the psychiatrists and psychologists who examined the defendant were grounded in part on accounts furnished by him of the events leading to the prosecu-

---

[10] True, HRS § 704-408 as it read before its amendment did not empower the court to render a judgment of conviction. Yet this is not dispositive.

The statute did not authorize the entry of a judgment of conviction because such authority would have infringed the right of criminal defendants to be tried by juries composed of their peers. A judgment of acquittal, of course, would not be deemed an infringement of this right. For while a "trial judge is . . . barred from attempting to override or interfere with the jurors' independent judgment in a manner contrary to the interests of the accused," this "limitation on the role of a trial judge . . . has never inhibited his ruling in favor of a criminal defendant." United States v. Martin Linen Supply Co., 430 U.S. 564, 573 (1977).

tion. The videotaped interviews, tapes of which were made available to the State, undeniably implicated the defendant in the offenses charged.

His involvement is undeniable because the parties agreed, with court approval before the defendant submitted a plea for acquittal, that:

> in the event the case proceeds to trial on the merits and the Defendant takes the stand and directly contradicts, in the defense case in chief, statements made by him during any of the audio cassette or video cassette interviews, the prosecution may introduce said portions of the audio-video cassette interviews for the purpose of seeking to impeach the Defendant's testimony . . . [and] if the Defendant takes the stand and if relevant, the Prosecution may cross examine the Defendant relative to any statements made by him during any audio or video interviews and that if relevant the Prosecution may introduce those portions of the audio or video interviews in rebuttal for the purpose of contradicting or impeaching him.

Thus, the die was cast when the claim of irresponsibility was advanced. The defendant committed himself thereby to pursue the defense of insanity to judgment, for he could not hope thereafter to controvert testimony that he had engaged in the proscribed conduct.[11] Realistically, he ran a substantial risk of conviction by moving for an early determination of part of the general issue in the case and proceeding to a hearing.

### B.

Built as it is on a misreading of "a special plea in bar" and an infirm factual foundation, the court's conclusion that the defendant would not be twice put in jeopardy by a second adjudication of an issue once adjudicated in his favor cannot be reconciled with prescribed constitutional standards in the area of concern.

Our concern here is with a judgment of acquittal and further

---

[11] This was confirmed during oral argument before this court. In response to a query on a related point, counsel for defendant unequivocally stated he would resubmit the issue of criminal responsibility to the trial court for decision on the evidence already adduced if the case is remanded.

jeopardy. "Perhaps the most fundamental rule in the history of double jeopardy jurisprudence has been that '[a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy and thereby violating the Constitution.' *United States v. Ball*, 163 U.S. 662, 671 (1896)." *United States v. Martin Linen Supply Co.*, 430 U.S. at 571. "[T]he law attaches particular significance to an acquittal. To permit a second trial after an acquittal, however mistaken the acquittal may have been, would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant so that 'even though innocent he may be found guilty.' " *United States v. Scott*, 437 U.S. 82, 91 (1978) (quoting *Green v. United States*, 355 U.S. 184, 188 (1957)).

But it is not only a verdict of acquittal returned by a jury that triggers the protection against the potential risk associated with further prosecution. A directed verdict of acquittal suffices in this regard, *Fong Foo v. United States*, 369 U.S. 141, 143 (1962), and so does "a judge's acquittal after the jury disagrees and is discharged." *United States v. Martin Linen Supply Co.*, 430 U.S. at 574. And the governing principle formulated by the Supreme Court is: "A judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed and terminates the prosecution when a second trial would be necessitated by a reversal." *United States v. Scott*, 437 U.S. at 91 (footnote omitted).[12]

Although a direct acquittal on a motion submitted before actual trial has not been discussed in the relevant case law, the Court has made it clear that the substance of the judge's action determines whether the acquittal would terminate the prosecution. The determinative question, the Court said, is "whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *United States v. Martin Linen Supply Co.*, 430 U.S. at 571. Viewing what transpired below in the light of the Supreme Court's teach-

---

[12] No double jeopardy problems would be implicated in a government appeal from "a judgment of acquittal following a jury verdict of guilty," which is now allowed. *See* HRS § 641-13(a). For a reversal there would result in a reinstatement of the verdict, not a retrial. *See* United States v. Wilson, 420 U.S. 332, 344-45 (1975).

ings, I would declare there was an acquittal that rules out further prosecution of the defendant.

### C.

The defendant was accused of crimes for which a culpable state of mind is a necessary element. He sought a ruling from the circuit court on whether insanity prevented him from forming the required intent. The applicable statute, HRS § 704-408 as it read before its amendment in 1980, vested the court with full authority to directly acquit him if "satisfied" after a hearing that his mental impairment was sufficient to exclude responsibility,[13] and the court did so. In effect, it weighed the evidence adduced by the parties and arrived at a decision that the State had failed to submit enough evidence "to rebut . . . [the] defendant's essentially factual defense of insanity." *United States v. Scott,* 437 U.S. at 97.

---

[13] The applicable statute on its face empowered the court to directly acquit the defendant if "satisfied" his mental impairment was "sufficient to exclude responsibility." *See* note 2 *supra.* This more than implies the court was to weigh the evidence and rule on a factual element of the offenses. Any doubts on this score are laid to rest by the Penal Code Commentary on HRS § 704-408; it read as follows:

This section provides for the direct qualified acquittal of the defendant when the report filed pursuant to § 704-404 satisfies the court that at the time of the conduct alleged the defendant suffered from a physical or mental disease, disorder, or defect which precluded responsibility. A hearing shall be had on the issue of the defendant's responsibility if it is requested by either party or the court. If the court is satisfied on the basis of the report or the hearing or both that the defendant should not be held responsible for the conduct alleged, it shall, upon motion by the defendant, acquit the defendant. Thus, a trial in such cases will be avoided. If the defendant maintains that he did not engage in the conduct alleged, or has a defense in addition to that excluding responsibility, he can, of course, withhold the motion and the case will proceed to trial.

The section changes the prior law in that it *vests the power of direct acquittal in the court* and does not make it dependent on prosecutorial discretion. (Emphasis added).

That HRS § 704-408 prior to its amendment was to be interpreted in the foregoing manner was reaffirmed when the section was amended. *See* Sen. Stand. Comm. Rep. No. 689-80, in 1980 Senate Journal, at 1335 (In commenting on the proposed amendment to HRS § 704-408, the Senate Judiciary Committee said: "Presently the law allows an insanity defense to be heard, and ruled on in the first instance, by a judge at a pre-trial hearing. The judge can enter a judgment of acquittal on the grounds of 'physical or mental disease, disorder, or defect excluding responsibility' or allow the defense to go to a jury.").

The circuit court, notwithstanding the majority's conclusion that the court was without power to do so, had clear authority to enter the judgment of acquittal. *See* note 13 *supra*. That the acquittal may have resulted from an erroneous application of controlling legal principles as the majority holds, may affect "the accuracy of that determination, but . . . does not alter its essential character." *United States v. Scott*, 437 U.S. at 98. It still "represents a resolution [in the defendant's favor], correct or not, of some . . . of the factual elements of the offense[s] charged." *United States v. Martin Linen Supply Co.*, 430 U.S. at 571.

"The notion that the prosecution, having failed to make a sufficient case against . . . [the] accused, should be given a second opportunity to do better seems fundamentally inconsistent with the Double Jeopardy Clause." 2 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: *Criminal 2d* § 470, at 677-78 (1982) (footnote omitted). I would dismiss the appeal for want of jurisdiction.