72364. PRICE v. THE STATE.
(347 SE2d 608)

BIRDSONG, Presiding Judge.

David Eugene Price was tried upon two counts of aggravated assault and found "guilty but mentally ill." He was sentenced to 20 years, to serve ten, and the balance on probation. On appeal he pleads that the evidence he was insane at the time of the offenses was so overwhelming that he should be granted a new trial for the verdict was contrary to the evidence; that the finding that he was competent to stand trial was error; and that the guilty but mentally ill statute is

unconstitutional because it permits the jury to compromise on the issues of his sanity and guilt and thus effectively deprives him of his right to be acquitted. (The latter is a contention this court is not empowered to address but for reasons explained, we retain jurisdiction of the case.)

The evidence showed appellant entered the Disco Fashion store on the afternoon of April 14, 1984, and approached clerk Avis Boyd about some jeans he said he had bought there. He pointed at some holes in the jeans he wore and said, "You and your partner, you [messed] up my jeans." Witnesses testified appellant's jeans were raggedy and faded and looked five years old. None of the employees had seen appellant in the store before that day and none recalled selling him anything. Appellant had his eyes "bucked real wide" and was walking toward Boyd. She was afraid because of the crazy way appellant was acting; she said to the manager, Emad Fino, "This man is crazy." Fino asked appellant what his problem was; appellant said the clerk (Boyd) had "ripped him off a pair of jeans." Fino moved between Boyd and appellant, told appellant he could not "hit ladies in the store" and asked him to leave. Fino then ushered appellant out the door with no trouble but immediately appellant went back into the store, bent down to his socks in front of Ms. Boyd and pulled out a butcher knife. He pointed the knife at Boyd, said "I'm going to kill you," and started to walk around the counter. Fino came in, swung a mannequin's torso at appellant but missed, and appellant grabbed Fino from behind. Fino could stop the knife going in his neck only by grabbing the blade. The two fell to the floor, struggling, until a policeman arrived and both men dropped the knife as the policeman ordered. Appellant lay looking at the officer for several seconds, then suddenly crouched up and reached for the knife. At this point the policeman shot appellant in the neck.

Appellant's aunt, who raised him, testified that she first noticed odd behavior in him when he was twelve, when he threw down an ice cream cone and lay down in the car because he thought people were watching him and making fun of him. As he grew older, the strange moods worsened. He would not recognize people, would stop bathing and stop changing clothes. He would walk to Cedartown, a distance of sixty to seventy miles, without anyone knowing where he was, and when he arrived his feet would be terribly swollen. In these moods, his face would change and turn real dark and he would seem to be in a deep, deep study. In his right mind, he could not remember hearing voices, but when not in his mind, he would say, "Why do you all want to do this to me. . . . I heard you. I'm not crazy"; she could hardly have the television or radio on because he thought everything that was said on the news was about him. She had taken him to the hospital as many times as she could, but had to call the police to help. At

times he would almost cry, wondering "why . . . this was happening to him and could he ever get straight. And he did all he could to get straight." He did everything anybody told him that they thought would help. He would get out and exercise "trying to get his mind back," would get out and get a job, would get out and get an apartment; but these moods would overtake him on the job and he would be fired. He could not hold a job. He could not hold an apartment because these moods would take over him, and when they did he could not control himself. He never drank and was not on "dope." When he was normal, he tried to play guitar at church and tried to play in a big band; but his fellows would come to pick him up on a Saturday night and he would not even recognize them. When he was not in his right mind, he "didn't know anything mostly of what went on." Then he would come out of these "moods" and would apologize: "I don't know what I did or where I went or what happened. But I'm sorry." She had taken him to the hospital over and over; he would get a little calmer and then they would release him. He would take the medication and would get real quiet, like a zombie, "just a drag," and he would sleep and sleep and then wake up and sleep some more. He would take the medication until he got tired of sleeping; then he would stop, and get better. Each time he would believe he was normal and felt sure it would not happen again, and he would move out and get an apartment. But then it would overtake him and he would lose his apartment, and strangers would get in touch with the aunt and tell her something was wrong.

He would have gotten violent with the aunt but finally she adjusted herself and accepted he was sick and could deal with him more easily. She never understood why the hospitals kept releasing him, because he was sick. They knew he would hear voices. They knew, and had told her, that he could easily kill someone and not even realize what he was doing. The family had worried desperately that somebody would kill him or he would hurt somebody when he was in these moods. Sometimes it would be a month or two before he would have to go to the hospital. He had been in the hospital in December before this incident in April; maybe he should have gone back sooner but it just wore her out and she did the best she could, until she just could not any longer. She saw him in the hospital right after the incident; he just was not aware that he had done something wrong. He thought somebody had mistreated him and had really taken advantage of him, and was real hurt that somebody would do him like that. He told her he went to return some pants and the store did not want to exchange the pants; a fight broke out and the policeman shot him for nothing.

A psychiatrist at Georgia Regional Hospital testified the appellant had been hospitalized on an emergency basis seven times between June 1982 and December 1983, the last time four months

before this incident. He testified that appellant would each time be given medication, "stabilized" and released. He diagnosed appellant as having schizophrenia, undifferentiated, chronic.

The court-appointed psychiatrist testified. She diagnosed appellant as paranoid schizophrenic; the disease in appellant is incurable with medications and is chronic, meaning it is present most of the time and never really goes away, although he has periods of remission. He functions well at times but has periods of not functioning at all. He has poor insight into his illness; the failure of such patients to continue on medication is common. He had some memory of the events as he understood them. He told her he went into the store to return some pants and pulled a knife to calm the other person down, that his nerves had been "sick" for two weeks before the event. She concluded he was paranoid at the time of the assault, that he "misperceived the danger" and may not have fully appreciated his actions.

Appellant testified that the clerk Avis Boyd "had the other young man to attack me" when he went in to confront her about the money she had "ripped [him] off with" by overcharging him for the dress pants he had on. Somebody on the street told him his pants were cut, "so many different strange people. They didn't say it, they just said so I could hear it." All that stuff that was happening to him was giving him some kind of nervous breakdown, and Ms. Boyd took advantage of it. When he confronted her about the dress pants, she started acting real crazy, violent. The man jumped him because he said appellant did not like women, and appellant only defended himself. The policeman stared at appellant about 30 seconds and shot him, he did not know why. Appellant was "having a breakdown, true enough, but [he] knew they were [policemen]." He has a lot of problems with people talking about him, information they get from mental hospitals. He does not take medication all the time because it gives him side effects.

The court-appointed psychiatrist testified appellant was not malingering. The trial court agreed that "malingering is [not] an issue in this case." *Held*:

1. Questions of the constitutionality of any statute must be addressed to the Supreme Court, not the Court of Appeals. Constitution of Georgia, Art. VI, Sec. VI, Par. II. However, the Supreme Court has upheld the constitutionality of the "guilty but mentally ill" statute, in *Keener v. State*, 254 Ga. 699 (334 SE2d 175).

The appellant urges the statute unconstitutionally deprives him of his defense of insanity because it allows the jury to compromise by finding him guilty but mentally ill. The Supreme Court in *Keener*, while upholding the statute's constitutionality, considered this problem. The court held that when the trial court charges the jury on the defense of insanity and on guilty but mentally ill at the time of the crime, "*the trial court must make clear to the jury in its charge* that

if they find the defendant did not have the mental capacity to distinguish between right and wrong (or acted because of delusional compulsion), they must find the defendant not guilty by reason of insanity and must not find the defendant guilty but mentally ill. *That is to say, if the jury finds the defendant not guilty by reason of insanity, their deliberations must cease, and the jury should not thereafter consider whether the defendant was guilty but mentally ill.* [Emphasis supplied.] A jury is not authorized to find that the defendant did not know right from wrong *and* is guilty but mentally ill." (pp. 702-703).

In *Keener*, the trial court correctly charged "that if [the jury] found that the defendant did not have reason sufficient to distinguish between right and wrong, that would end their consideration of the case."

The trial judge in this case did not instruct the jury it must cease deliberation if it found defendant did not have reason to distinguish right and wrong at the time of the act. He instructed the jury on the insanity defense, and then said: "There is yet another verdict that you may return. And that is . . . guilty but mentally ill."

This error was harmful because it allowed the jury to do what it could not do: render a compromise verdict. In light of the evidence that was undisputed except for appellant's own account — that he went into the store to return or confront the clerk about an old pair of faded, raggedy jeans and was immediately perceived by this and his demeanor as being a crazy man, and the entire events ensued in the same course — without question we find it highly probable that the jury may have found the defendant did not have reason to distinguish right and wrong but compromised by finding "yet another verdict," guilty but mentally ill. *Johnson v. State,* 238 Ga. 59, 61 (230 SE2d 869); *Kirkland v. State,* 141 Ga. App. 664 (234 SE2d 133).

The appellant did not raise this charge as error below or on appeal; nevertheless, we will address it by virtue of OCGA § 5-5-24 (c), as "substantial error in the charge which was harmful as a matter of law," by operating to deprive appellant of his right to be acquitted if adjudged insane at the time of the act and thus depriving him of a fair trial. Compare *Maynard v. State,* 171 Ga. App. 605 (320 SE2d 806). See *Fowler v. Gorrell,* 148 Ga. App. 573, 576-577 (251 SE2d 819).

In view of this ruling, we find it unnecessary to consider the remaining enumerations of error.

2. This jury charge was also unclear on a subject that is often misunderstood; to wit, that the "delusional compulsion" which will acquit a defendant of a crime is only that delusional compulsion which *"would, if true, [justify] the act."* (Emphasis supplied.) *Brannen v. State,* 235 Ga. 505, 506 (220 SE2d 264); *Kirkland v. State,* 166

Ga. App. 478, 481 (304 SE2d 561). Thus, for example, a psychiatric expert may urge that a delusion of an individual that he is another person or personality should excuse the individual of a criminal act committed by that other person or personality and the individual could not be "legally accountable"; but in fact, such delusion by itself would not excuse the act under the law, because the individual's delusion simply that he is another person would not justify a criminal act. See *Kirkland*, supra.

*Judgment reversed. Banke, C. J., and Sognier, J., concur.*

DECIDED JUNE 17, 1986 —
REHEARING DENIED JULY 3, 1986 —

*Amy Jean Griffith Dever*, for appellant.
*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Benjamin H. Oehlert III, Deborah W. Espy, Assistant District Attorneys*, for appellee.