[No. 29438.    *En Banc.*    June 19, 1945.]

*In the Matter of the Appeals of* PEARCE Co., INC., *et al.,*
*Respondents,* v. E. B. RILEY, *as Commissioner of Un-*
*employment Compensation and Placement, Appellant.*[1]

The Attorney General, George W. Wilkins, *and* Bernard
A. Johnson, Assistants, *for appellant.*

*Edward Starin,* for respondents.

ROBINSON, J.—This action involves certain contributions
demanded of the respondents by the commissioner of un-
employment compensation and placement, to wit:    From
Pearce Co., Inc., $97.75, for the period of July 1, 1939,
through June 30, 1940; from Industrial Cosmetics, Inc.,

[1]Reported in 160 P. (2d) 506.

$176.74, for the period January 1, 1939, through June 30, 1940; from Joseph Gluck, doing business as a brokerage, $37.06 for the period January 1, 1938, through June 30, 1940, and doing business as Joseph Gluck Auction Galleries, $131.49, for the period of January 1, 1938, through June 30, 1940. These assessments having been confirmed by an order of the commissioner on June 13, 1943, the respondents appealed therefrom to the superior court of King county, which, on June 10, 1944, ordered, adjudged, and decreed that the respective parties should not be required to pay these sums or any other sums with reference to the periods stated. The commissioner appeals to this court.

The superior court heard the matter upon stipulated facts, and we, of course, review its decision on the same stipulation. Since to state the terms of the stipulation in our own language would be to convert it into a species of hearsay, we feel obliged, in spite of its length, to quote it in full. We, however, number the paragraphs for convenience in reference.

"It is hereby stipulated by and between the Office of Unemployment Compensation and Placement of the State of Washington, and Joseph Gluck Auction Galleries, Joseph Gluck Brokerage, Industrial Cosmetics, Inc., Pearce Co., Inc., the petitioners, by their respective counsel, Edward Starin for the petitioner, and Frank W. Foley, Assistant Attorney General, for the Office of Unemployment Compensation and Placement, that the following facts, pertaining to the liability of the said petitioners for contributions to the Unemployment Compensation Fund of the State of Washington, are true, full and correct:

1. "Industrial Cosmetics, Inc., a corporation, was incorporated on or about February 1, 1936, with an authorized capital of $4,000, represented by 40 shares of common stock at $100 par value per share. Said business was instituted by one Walter Nevler, for the purpose of operating a plant for the manufacture of cosmetics and toilet preparations. Said Nevler had been formerly employed by Dyart Laboratories, Inc., and in the latter part of 1935, said Dyart Laboratories arranged to discontinue operations and to sell its manufacturing facilities to said Nevler. In order to provide the necessary financing it became necessary for the said Nevler to borrow the funds required. He ar-

ranged with Mr. Joseph Gluck for the loan of the amounts which would be required. *In order to secure* the said Joseph Gluck for the repayment of the funds advanced and to be advanced, the Industrial Cosmetics, Inc., was organized with an original paid in capital stock of $1,000, which was the amount advanced by said Gluck. Ten shares of the capital stock of said corporation were issued to said Gluck, who was elected president of the corporation, with Walter Nevler as secretary-treasurer. At no time since the inception of the business of the Industrial Cosmetics, Inc., has the said Gluck participated, in any manner, in the operation or management of said business. He has not participated in, nor received any of the profits of said company. He has not rendered any services in behalf of said corporation and has not received any compensation or remuneration from said corporation. He has not exercised any control over the employees of said company; he has not employed or discharged any of said employees and has not directed their activities in any respect. He has not exercised at any time, any voice in the management of the business of said corporation or in the determination of the policies thereof. (Italics ours.)

2. "The said Gluck has, and has had, no knowledge or experience whatsoever in the business of manufacturing, distributing or selling cosmetics or toilet preparations. Aside from the transaction with Industrial Cosmetics, Inc., as herein set forth, he does not now have, nor has he ever had, any ownership, control or management of any other concern or business which has manufactured, sold or distributed cosmetics or toilet preparations. That at all of the times involved in this proceeding, and for many years last past, the principal business of the said Joseph Gluck has been the financing of, and loaning of capital to various business enterprises of a widely varied nature. In almost every instance where the said Gluck has financed enterprises in a manner similar to those involved in this proceeding he has secured the advances made by him, either by taking title to the assets of the particular business or by holding capital stock in a corporation in cases where the particular business was incorporated.

3. "At all times since February 1, 1936, the said Joseph Gluck has held, and now holds, the aforesaid ten shares of the capital stock of Industrial Cosmetics, Inc., in his own name. No additional shares of stock have ever been issued. At the time that said company was incorporated, it was orally understood and agreed between the said Gluck and

the said Nevler, that Nevler was to have the right to repay, at any time, the amount advanced by Gluck as aforesaid, with interest, and to receive a transfer of the shares of stock held by Gluck; it was further agreed by said parties that Gluck was not to receive any additional shares of the stock of said company, except to secure any additional funds which might be advanced by Gluck, to the said corporation; that since the inception of said business, it has not been or become necessary for the said Gluck to advance further sums to said business and only the original allotment of ten shares to said Gluck, as aforesaid, have been issued.

4. "That at the present time, the total capital and surplus account of Industrial Cosmetics, Inc., is the sum of $3,835.35; that the said Walter Nevler has arranged for the dissolution of said company, and has further arranged for the repayment of the sum of $1,000, with accrued interest to the said Joseph Gluck; that the said Gluck will not receive under said dissolution plan, any portion of the accrued surplus or profits of said corporation.

5. "During the calendar year 1938, the said corporation employed a total of three different individuals in each week, exclusive of Joseph Gluck, and at no time during the said year or any subsequent calendar year, were there as many as eight different individuals, in the employ of said corporation.

6. "Prior to April 12, 1938, Mr. A. Freeman, of Seattle, Washington, was engaged in the operation of a business known as Freeman's Shoe Stores, a men's furnishing haberdashery and shoe business; Freeman's Shoe Store admittedly being a liable employer under the Unemployment Compensation Act, having employed more than eight individuals at all times subsequent to January 1, 1937 and until April 12, 1938; that on or about April 12, 1938, being heavily indebted, the said Freeman, made a common law assignment for the benefit of his creditors, to the Seattle Association of Credit Men; that prior to, and at the time of the making of this assignment, the said Freeman had been and was indebted to the said Joseph Gluck, in a considerable sum, for advances made by Gluck; the said Gluck, in order to preserve his interest, and to avoid a possible loss, endeavored to assist the said Freeman in making a composition with Freeman's creditors; their efforts were unsuccessful, and Freeman was compelled to make the aforesaid common law assignment for the benefit of creditors; that on or about the said 12th day of April, 1938, the

Seattle Association of Credit Men as assignee, held a sale of all of the assets of the said Freeman Shoe Store, at which sale, Joseph Gluck was the high bidder; the said assets were purchased by said Gluck under an oral agreed arrangement with Freeman whereby the said Freeman was to repay to Gluck the amount which was to be advanced by Gluck to purchase said assets, together with the amount of Freeman's prior indebtedness to Gluck; title to said assets was to be taken in the name of Gluck and the business was to be operated under his name for a two-fold purpose, namely (1) to secure Gluck for the advances to be made and for the repayment of said indebtedness and (2) to make possible the continual operation of the business of the Freeman Shoe Stores without interference from Freeman's creditors; the said business was operated, pursuant to this arrangement, under the name of Joseph Gluck, from April 12, 1938, to September 1, 1938.

7. "On or about September 1, 1938, the said business was incorporated under the name 'Pearce Co., Inc.'; all of the capital stock of said company, with the exception of a few qualifying shares, were issued to Joseph Gluck, said capital stock was issued to Gluck for the primary purpose of securing Gluck for the advances and indebtedness aforesaid; although Gluck was president of Pearce Co., Inc., his connection with said corporation, at all times, was entirely formal; at no time prior to or since April 12, 1938, did Gluck participate in any manner in the management of the Freeman Shoe Stores or Pearce Company, Inc.; at all times involved in this proceeding the said Freeman Shoe Stores and Pearce Company, Inc. have been under the management and supervision of Mr. A. Freeman; at no time during the period between April 12, 1938, and September 1, 1938, was the said Gluck in actual, physical possession of the assets of the Freeman Shoe Stores; at no time has Gluck rendered any physical services in behalf of the Freeman Shoe Stores or Pearce Company, Inc.; he has not received any compensation or remuneration of any kind, excepting the payment of accrued interest on the indebtedness aforesaid, from either the Freeman Shoe Stores or Pearce Co., Inc.; Gluck has not participated in nor received any of the profits of either the Freeman Shoe Stores or Pierce Co., Inc.; Gluck has not at any time, employed or discharged any of the employees of either Freeman Shoe Stores or Pearce Co., Inc. and has not directed their activities in any respect.

8. "Pursuant to the agreement made at the time of the purchase of the assets of Freeman Shoe Stores from the Seattle Association of Credit Men, Gluck held title to the said assets and has held title to the stock of Pearce Co., Inc. as security for the indebtedness owing to and advances made by him, subject to the right of Freeman to receive a complete and absolute transfer of such title upon repayment of the amount of said indebtedness and advances; that the total original amount of the indebtedness owing to Gluck by Freeman, together with the advances made by Gluck for the purchase of the assets of Freeman's Shoe Stores, was in excess of $12,000; that during the period beginning April 12, 1938, and to this time, Freeman has repaid, in monthly installments, all of said amount, with the exception of a sum less than $300, together with interest thereon. During the period from April 12, 1938, to September 1, 1938, the Freeman Shoe Stores employed six different individuals; at all times material hereto, Pearce Co., Inc. employed six different individuals, and at no time during the period Sept. 1, 1938, to June 8, 1939, were there as many as eight different individuals in the employ of the said corporation.

9. "At all times material to this proceeding Joseph Gluck was the individual proprietor of Joseph Gluck Brokerage and of the Joseph Gluck Auction Galleries. During the calendar year 1937, Joseph Gluck employed in the two businesses together, more than eight different individuals, but did not employ, during said calendar year, eight or more different individuals in any twenty weeks. During the calendar year 1938, there were employed in each week between April 12 and September 1, in the Joseph Gluck Brokerage, Joseph Gluck Auction Galleries and Freeman Shoe Stores, at least eight different individuals, but there were not employed in the Joseph Gluck Brokerage and Joseph Gluck Auction Galleries eight different individuals during said period.

10. "If it is determined that the Industrial Cosmetics, Inc. and Pearce Co., Inc. may properly be joined with Joseph Gluck Brokerage, an individual proprietorship, and the Joseph Gluck Auction Galleries, an individual proprietorship, then, and in that event, the assessments against them are just and correct. The amounts stated in these orders and notices of assessment are not in dispute. It is further hereby agreed that if during the period from April 12, 1938, to September 1, 1938, Joseph Gluck owned or controlled Freeman's Shoe Stores, which was purchased

on April 12, 1938, by Joseph Gluck from the Seattle Association of Credit Men, to whom Freeman had made an assignment, then and in that event the assessments against Joseph Gluck Brokerage and Joseph Gluck Auction Galleries, are just and correct for the reason that Joseph Gluck as an individual became an employing unit and also an employer within the meaning of the pertinent statute, irrespective of whether or not the employment of the two said corporations is combined with the employment in his individually owned businesses, it being therefore admitted that Joseph Gluck as an individual employed eight or more different individuals in twenty or more weeks of the calendar year 1938."

The original unemployment compensation act of 1937 defined an employing unit as any individual or type of organization employing "eight or more" individuals performing services in the state. On June 8, 1939, an amendment became effective whereby "eight or more" was changed to "one or more." As already indicated, a portion of the claims for the contributions in question arose under the original act, and a portion under the act as amended in 1939.

Much space is consumed in the appellant's brief in explaining exactly how the commissioner arrived at each assessment. While this has been found useful to the court, we think, in view of the statement of the problem involved found in paragraph 10 of the stipulation, that any discussion along that line in this opinion would be of no value to anyone.

It is said, in the last paragraph of the stipulation, above quoted, that, if it is determined that Industrial Cosmetics, Inc., and Pearce Co., Inc., may properly be joined with Joseph Gluck Brokerage, an individual proprietorship, and the Joseph Gluck Auction Galleries, also an individual proprietorship, then and in that event the assessments against them are just and correct, which, we take it, carries with it the admission that, if they were not properly joined, the assessments are unjust and incorrect.

It is further stated, in the final paragraph of the stipulation, that, if, during the period from April 12, 1938, to September 1, 1938, Joseph Gluck owned or controlled Freeman

Shoe Stores, then and in that event the assessments against Joseph Gluck Brokerage and Joseph Gluck Auction Galleries are just and correct. And again, we take it, this carries with it the admission that, if Gluck did not own or control Freeman Shoe Stores during that period, then the assessments against Gluck, doing business in the capacities mentioned, are unjust and incorrect.

In the final analysis, the appellant rests his case, as to all four of the assessments with which we are concerned, upon the following provisions of section 19 (f), chapter 162, pp. 609, 610, Laws of 1937 (Rem. Rev. Stat. (Sup.), § 9998-119 (f)):

"(f) 'Employer' means: . . .

"(2) Any employing unit which acquired the organization, trade or business, or substantially all the assets thereof, of another which at the time of such acquisition was an employer subject to this act; . . .

"(4) Any employing unit which together with one or more other employing units, is owned or controlled (by legally enforcible means or otherwise) directly or indirectly by the same interests, or which owns or controls one or more other employing units (by legally enforcible means or otherwise), and which, if treated as a single unit with such other employing unit, would be an employer under paragraph (1) of this subsection; . . ."

It is urged that the instant case is controlled by our former decisions in *State v. Kitsap County Bank*, 10 Wn. (2d) 520, 117 P. (2d) 228; *In re Tacoma Auto Freight Depot*, 19 Wn. (2d) 334, 142 P. (2d) 485; and *In re Pacific Coast Adjustment Co.*, 20 Wn. (2d) 734, 147 P. (2d) 820. It is, therefore, necessary to discuss these decisions briefly. We think that the *Tacoma Auto Freight Depot* case may be at once eliminated as having no bearing on the instant case by quoting the following paragraph from the opinion:

"In the case before us, the appellants pooled their interests and business activities and adopted and pursued a method of joint management and operation of two auto freight lines to and from a central freight receiving, exchange, and delivery depot, the latter also serving other auto freight lines. They were operated and controlled by and through an interlocking directorate and official per-

sonnel, and the active business management of all of them was delegated to John H. Potter and Mark R. Jones. Each of the three appellants was an employing unit, and, when they pooled their business activities, as they did here, and vested the control of a joint activity in an interlocking directorate and official personnel, it seems clear to us that it follows that the employing units were controlled directly by the same interests; and the fact that this control might at any time have been taken away by the action of the stockholders of the corporate employing units, can make no difference. So long as the respective employing units chose to operate in the manner disclosed by the record, they were collectively an employer and subject to the making of contributions to the unemployment fund."

In the *Kitsap Bank* case, *supra,* the determining point, in so far as the decision is material in this case, was that Mr. F. E. Langer owned the majority of the stock of the Kitsap County Bank, and also owned the majority of the stock of the First National Bank of Poulsbo. It was held, by a five-to-three decision, that these two employing units were controlled by the same interest by legally enforcible means, on the theory that the owner of the majority of the stock of a corporation holds the means of legally controlling that corporation.

In the *Pacific Coast Adjustment Co.* case, the basic facts were very similar. Faulk and wife owned all of the stock of the Pacific Coast Adjustment Company, a corporation, doing a collection business in Aberdeen, Washington. They also owned fifty-one shares of the National Association of Creditors, Inc., a corporation engaged in the collection business in Tacoma. In that case, it further appeared that Faulk and wife exercised no actual control over the Tacoma institution in any way whatsoever; it being wholly and independently managed by Faulk's brother, who owned the remaining forty-nine shares of stock. It was held, nevertheless, that, within the meaning of the statute, legally enforcible control of both corporations was, in fact, held by the same interest.

The respondents contend that neither of the decisions which we have just discussed is decisive of this case; and we are of that opinion. In each of those cases,

the majority of the stock of two corporations was owned absolutely by the same interest. They had, as incidental to the ownership of the shares, the right to vote. Through this right they could legally control both corporations. The control of a corporation is a very valuable right. Every experienced business man, as well as every lawyer of experience, can recall instances where a fabulous sum was paid for but one share of stock in order to achieve such control.

The words "In order to secure," which we have italicized in quoting paragraph one of the stipulation, admit that Gluck bore no such relation to Industrial Cosmetics, Inc. It is an admission that he held the stock as security. That being so, someone else was manifestly the real owner; in this case, Nevler. It seems clear to us, upon reading the admitted facts, as recited in paragraphs 1 to 4, inclusive, of the stipulation, that, if, during the period in question, an action had arisen in which the right to actual control of the corporation was in dispute between Gluck and Nevler, a court would certainly have held that Gluck was merely a creditor of Nevler, held Nevler's stock for security only, and was a mere pledgee, or, at most, an equitable mortgagee. We cannot doubt but that, in such a case, a court would brush aside the apparent record ownership just as readily as it would disregard the ordinary effect of a warranty deed and hold it to be a mortgage, upon its being shown that the conveyance was, in fact, made to furnish security for a loan or some preexisting obligation of the grantor to the grantee.

We further conclude, from the recital of facts made in paragraphs 6 to 8 of the stipulation, that Pearce Co., Inc., was not owned or controlled by Gluck, and also that the business, when formerly conducted as Freeman Shoe Stores, was not owned and controlled by Gluck, even though operated under his name during the period from April 12, 1938, until the business was incorporated as Pearce Co., Inc., on September 1, 1938. As to both of these matters, it is necessary to examine all of the relevant paragraphs of the stipulation. It is true, as a physical fact,

that Gluck did purchase the assets of the Freeman Shoe Stores as Freeman's assignee for the benefit of his creditors, and advanced the purchase price; but, says the stipulation in paragraph 6:

" . . . the said assets were purchased by said Gluck under an oral agreed arrangement with Freeman whereby the said Freeman was to repay to Gluck the amount which was to be advanced by Gluck to purchase said assets, together with the amount of Freeman's prior indebtedness to Gluck; title to said assets was to be taken in the name of Gluck and the business was to be operated under his name for a two-fold purpose, namely (1) to secure Gluck for the advances to be made and for the repayment of said indebtedness and (2) to make possible the continual operation of the business of the Freeman Shoe Stores without interference from Freeman's creditors; the said business was operated, pursuant to this arrangement, under the name of Joseph Gluck, from April 12, 1938, to September 1, 1938."

This is entirely consistent with the respondents' theory that, in doing these things, Gluck acted as Freeman's agent.

We requote a portion of paragraph 7:

"On or about September 1, 1938, the said business was incorporated under the name 'Pearce Co., Inc.'; all of the capital stock of said company, with the exception of a few qualifying shares, were issued to Joseph Gluck, said capital stock was issued to Gluck for the primary purpose of securing Gluck for the advances and indebtedness aforesaid; although Gluck was president of Pearce Co., Inc., his connection with said corporation, at all times, was entirely formal; at no time prior to or since April 12, 1938, did Gluck participate in any manner in the management of the Freeman Shoe Stores or Pearce Company, Inc.; at all times involved in this proceeding the said Freeman Shoe Stores and Pearce Company, Inc., have been under the management and supervision of Mr. A. Freeman; at no time during the period between April 12, 1938, and September 1, 1938, was the said Gluck in actual, physical possession of the assets of the Freeman Shoe Stores; at no time has Gluck rendered any physical services in behalf of the Freeman Shoe Stores or Pearce Company, Inc.; he has not received any compensation or remuneration of any kind, excepting the payment of accrued interest on the indebtedness aforesaid, from either the Freeman Shoe Stores or

Pearce Co., Inc.; Gluck has not participated in nor received any of the profits of either the Freeman Shoe Stores or Pearce Co., Inc."

We requote also the following portion of paragraph 8 of the stipulation:

"Pursuant to the agreement made at the time of the purchase of the assets of Freeman Shoe Stores from the Seattle Association of Credit Men, Gluck held title to the said assets and has held title to the stock of Pearce Co., Inc., as security for the indebtedness owing to and advances made by him, subject to the right of Freeman to receive a complete and absolute transfer of such title upon repayment of the amount of said indebtedness and advances; that the total original amount of the indebtedness owing to Gluck by Freeman, together with the advances made by Gluck for the purchase of the assets of Freeman's Shoe Stores, was in excess of $12,000; that during the period beginning April 12, 1938, and to this time, Freeman has repaid, in monthly installments, all of said amount, with the exception of a sum less than $300, together with interest thereon."

These portions of the stipulation do not present a picture of Gluck operating a shoe store on his own account from April 12, 1938, to September 1, 1938, and pocketing the gains and profits, but of Freeman operating a shoe store financed by Gluck and paying off his obligations to Gluck in monthly installments; and, after the business was incorporated on September 1, 1938, we do not find Gluck receiving money from the ownership of stock, but Freeman receiving the corporate profits and using them, or at least a portion of them, to pay off his obligations to Gluck. We cannot regard one as having legally enforcible control of a corporation who, admittedly, merely holds its stock in his own name as security only for a debt owed him by its real owner. He could not foreclose until default, and in any event would lose all claim to the stock upon tender of the sum due.

The judgment and order appealed from is affirmed.

BEALS, C. J., STEINERT, BLAKE, SIMPSON, JEFFERS, MALLERY, and GRADY, JJ., concur.

MILLARD, J., concurs in the result.