65988, 65989. KIRKLAND v. THE STATE (two cases).

BIRDSONG, Judge.

In June and August 1981, Phyllis Sharon Kirkland committed bank robberies in both Toombs and Emanuel Counties. Her method was virtually the same in each case: wearing a dark wig, large sunglasses, and jogging suit, she entered the banks when they were empty of customers, and, after pretending to want a money order, obtained large sums of money from the employees by brandishing a 9mm automatic pistol. In the Emanuel County bank, she told the employees that two men with machine guns awaited her outside; she made as if to spray the woman with mace but relented after the women pleaded with her. In Toombs County, she told the bank employees her husband awaited her outside with a machine gun. She was seen leaving the Emanuel County bank in a black Cadillac with dark tinted windows. The police soon captured her several miles outside Swainsboro. In the car with her were her two small children and the money from the robbery.

For the next three or four hours, she was rational and, except for the "normal" upset of anyone just arrested for bank robbery, was calm. She intelligently and rationally waived presence of counsel at that point and freely confessed to the crime. She accompanied the sheriff to various places in Swainsboro where she had thrown out or hidden her wig and other disguises. She also confessed to the Toombs County bank robbery. She stated: "That morning, I woke up. Something spoke to me and told me what to do. Bob and I were in debt about twenty thousand dollars. . . . I do not know exactly how much money I got. When I went to the bank in Vidalia [Toombs County], there were two women in the bank. I robbed only one of the women. There was a black man in the bank that worked there. I threw away the wig I was wearing and the jumpsuit. I was driving my same car, my Cadillac. I spent about two thousand, I don't know what that word is, bills. I think I got nine thousand dollars. I think there is fifteen hundred dollars at my house in the chimney. I was in Knoxville, Tennessee. I went to a nightclub and someone stole a lot of the money. My husband, Bobby, knows where the money is at in the chimney. The money was in a shoebox underneath the seat. We picked up a young white boy and he stole the money. When I went to the bank in Vidalia, I was wearing my sweatsuit. My girlfriend's name is Wanda Collins. She lives in Jellico, Tennessee. I stayed in Tennessee six weeks. Gary Collins from Tennessee should be at my house. My husband got Gary a job where he works at. . . .I got two thousand dollars in a savings account at the First National Bank in Vidalia. . . ." Appellant then accompanied the officers to her house,

where she asked her husband, "Bobby, what did you do with [the money from the Vidalia robbery]?"; he retrieved it from under the front seat of their truck.

Appellant was tried without jury, by the same trial judge in both counties. The Emanuel County record containing extensive psychiatric testimony was consolidated in the Toombs County trial. Identical verdicts with findings of fact and conclusions of law were rendered.

There is no dispute that appellant committed the bank robberies. But Phyllis Sharon Kirkland contended, and the trial judge found, that she "has a multiple personality [disorder] which has been properly diagnosed as psychogenic fugue." Appellant pleaded not guilty by reason of insanity, but the trial court retrospectively applied OCGA § 17-7-131 (Code Ann. § 27-1503) (effective July 1, 1982) and found the appellant "guilty but mentally ill."

On appeal, Phyllis Sharon Kirkland contends that the verdict is contrary to the evidence and the law; and that the trial court erred in failing to find appellant "not guilty by reason of insanity" through misapplication of the law and in contravention with the overwhelming and uncontradicted expert testimony. She also contends the trial court erred in ex post facto applying the 1982 "guilty but mentally ill" statute to the 1981 offenses. *Held:*

1. This appeal presents, in one instance, two issues taxing the outer limits of criminal law and psychiatric science. The undisputed psychiatric testimony describes appellant as having a disorder called psychogenic fugue, which is so like the "multiple personality" disorder that the doctors could only with great difficulty explain the difference, or even say there is a clear difference. In the facts of this case, the purported fugal personality, "Bad Sharon," is a well-developed, rational and conscious personality, so for legal purposes we will not distinguish them.

The conditions of multiple personality and its less refined cousin, psychogenic fugue, are extremely rare and certainly not fully understood nor perhaps fully accepted even by psychiatry. In general, the affected individual unconsciously "develops" alternate personalities to deal with trauma (e.g., child or sexual abuse) that the individual otherwise cannot endure. The alternate personalities are separate identities with highly individualized traits, behavior patterns, and complex social activities, even to the point of possessing different family histories, different ages, or even different nationalities. When faced with stressful situations, the individual may be dominated by one or more separate personalities; the "core" individual most often has no knowledge of the existence of any other

personalities, but may sometimes hear "voices" and will "lose time." She may wake up in a strange city thousands of miles from home, and find herself in possession of unfamiliar and uncharacteristic clothing and objects. The "core" personality has no control over the personality which is in domination, or consciousness; the transition to the alternate is involuntary and unknowing; she has no memory of what the other personality does. The alternate personality may stay in control for hours, months or years. A particular alternate personality may be, and often is, as its raison d'etre, a well-developed and complete personality in itself, rational and quite functional. Naturally the core personality stays often confused, and may even ultimately abdicate altogether in favor of another (or a platoon of others) who will separately function in society to the limit of their respective abilities.

We have surveyed the case law and, as far as we can ascertain, the question of criminal accountability of the multiple personality has heretofore been addressed only once, in 1982 in Ohio v. Grimsley, 3 Ohio App. 3d 265 (444 NE2d 1071). There, the Ohio court concluded without elaboration: "There was only one person driving the car and only one person accused of drunken driving. It is immaterial whether she was in one state of consciousness or another, so long as in the personality then controlling her behavior, she was conscious and her actions were a product of her own volition. . . . [We find no merit in the claim that] the court erred in finding that she failed to establish her defense of insanity, because the uncontroverted evidence was that her primary personality (Robin) was not conscious of the wrongfulness of the secondary personality's (Jennifer's) acts and did not have the ability to cause that personality to refrain from driving while drunk . . . . The evidence fails to establish . . . that Ms. Grimsley's mental disorder had so impaired her reason that she, as Robin or as Jennifer or as both, either did not know that her drunken driving was wrong or did not have the ability to refrain from driving while drunk." (PP. 1075-1076).

The law adjudges criminal liability of the person according to the person's state of mind at the time of the act; we will not begin to parcel criminal accountability out among the various inhabitants of the mind. Thus it was for very good and considered reasons that the Ohio court said: "There was only one person [committing the criminal act] . . . and only one person accused [of it]. It is immaterial whether she was in one state of consciousness or another, *so long as in the personality then controlling her behavior, she was conscious and her actions were a product of her own volition.*" (Emphasis supplied.) Ohio v. Grimsley, supra, p. 1076.

It is true that "no rules can be so specific as to embrace the

infinite variety of forms in which insanity, or derangement, may show itself; and that each case must depend very much upon the circumstances, facts and developments which attend it." *Roberts v. State,* 3 Ga. 310, 332. But in every such circumstance, including the existence of multiple personalities, the law is justified in governing accountability where "at the time of the [criminal] act . . . the person [had] mental capacity to distinguish between right and wrong in relation to such act . . ." (OCGA § 16-3-2 (Code Ann. § 26-702)) and was not acting "because of a delusional compulsion as to such act which overmastered his will to resist committing the crime," (OCGA § 16-3-3 (Code Ann. § 26-703)), which delusion would, if true, have justified the act. *Brannen v. State,* 235 Ga. 505, 506 (220 SE2d 264). If these elements are found to be present, in a case, the law will not inquire whether the individual possesses other personalities, fugues, or even moods in which he would not have performed the act or perhaps did not even know the act was being performed.

It was codified as the first "insanity defense" law of this state that "[a] lunatic or person insane, without lucid intervals, shall not be found guilty of any crime or misdemeanor with which he may be charged, provided the act so charged as criminal was committed in the condition of such lunacy or insanity; but if a lunatic has lucid intervals of understanding, he shall answer for what he does in those intervals as if he had no deficiency." (Cobb, 779; Code Ann. § 26-303, 1953 Rev.) This is essentially consistent with OCGA §§ 16-3-2 and 16-3-3 (Code Ann. §§ 26-702, 26-703), and is still the law of this state. "It may be that an unconscious person or a somnambulist could not commit [a crime], under the laws of this State," ( *Lewis v. State,* 196 Ga. 755, 763 (27 SE2d 659); see also *Starr v. State,* 134 Ga. App. 149 (213 SE2d 531)); but this would of course be because he lacks requisite criminal intent and mental capacity to distinguish right from wrong. The mere amnesiac who himself does not remember what happened, or the man whose own mind went "blank" at the crucial moment, can obviously not be excused if other evidence establishes that, whether the accused remembers it or not, he acted with the requisite criminal intent. See esp. *Reeves v. State,* 196 Ga. 604 (27 SE2d 375), where that defendant might today be examined with considerable interest as a possible multiple or fugal personality; and see Lee v. Thompson, 452 FSupp. 165.

It is settled that we are not bound by expert testimony as to the sanity or mental state of an accused, even where it is undisputed, but the fact finder may reject it out of hand ( *Moses v. State,* 245 Ga. 180, 181 (263 SE2d 916); see Lee v. Thompson, supra, p. 169). We think it is elementary, also, that while such expert witnesses may testify as to mental state, they are not competent to render an opinion as to the

impact of such mental state on *legal accountability.* The trial judge in this case accepted that appellant suffers from a multiple personality disorder, but ruled that the personality (be she Phyllis or Sharon, or both) who robbed the banks did so with rational, purposeful criminal intent and with knowledge that it was wrong. We find no fault with his finding that appellant was guilty but mentally ill.

2. It follows from everything we have said, that the trial court was fully authorized to find (and in fact did find) appellant guilty, and not legally insane or under a delusional compulsion (as defined by OCGA § 16-3-3 (Code Ann. § 26-703) and *Brannen,* supra) at the time of the acts. Hence, the application of OCGA § 17-7-131 (Code Ann. § 27-1503), in finding her "guilty but mentally ill," gives appellant the advantage of an ameliorative law. It reduces or molifies the penalty of a guilty verdict. It decidedly lessens the stigma of criminal guilt and provides for the treatment of her mental illness. It did not alter the rules of evidence nor require less or different testimony or evidence to convict of guilt beyond a reasonable doubt. It did not alter the situation of the accused to her disadvantage; to the contrary, it gave the appellant the advantage of her mental illness even though she did not sustain her insanity defense. *Todd v. State,* 228 Ga. 746 (187 SE2d 831); *Bailey v. State,* 210 Ga. 52 (77 SE2d 511); *Barton v. State,* 81 Ga. App. 810 (60 SE2d 173). Where the verdict of guilt is authorized by the evidence, the application of the "guilty but mentally ill" act is procedural, not substantive; it leaves untouched the substantive right to the insanity plea as an absolute defense (see *Winston v. State,* 186 Ga. 573 (198 SE 667); *Todd v. State,* supra). If the verdict of guilty is authorized by the evidence, the accused is given an additional advantage when the guilty but mentally ill statute is applied. See *Walker v. State,* 132 Ga. App. 274 (208 SE2d 5). The verdict was not an unconstitutional application of an ex post facto law.

*Judgment affirmed. Shulman, C. J., and McMurray, P. J., concur.*

DECIDED MAY 3, 1983.

*Charles B. Merrill, Jr.,* for appellant.
*Richard A. Malone, District Attorney,* for appellee.