[No. 59543-7.   En Banc.   April 29, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. DEA
WHEATON, *Appellant*.

*Randall Keys* and *Crawford, McGilliard, Peterson & Yel-
ish,* for appellant.

*C. Danny Clem, Prosecuting Attorney,* and *Pamela B. Loginsky, Deputy,* for respondent.

BRACHTENBACH, J. — The issue which defendant wants this court to review is how to determine whether a criminal defendant suffering from multiple personality disorder (MPD) was legally insane at the time of the offense. Troubled by the minimal facts presented and the paucity of legal analysis, we have closely examined the record and briefing. We have examined the factual findings and stipulations of fact in light of the medical reports and testimony designated as part of the record. We conclude the record and briefing are insufficient to decide the legal issue raised. We decline to consider the issue, and therefore affirm the trial court.

Defendant Dea Wheaton has been diagnosed as suffering from multiple personality disorder. According to the American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 300.14, at 269, 272 (3d rev. ed. 1987) (*DSM-III-R*), MPD[1] involves

    A. The existence within the person of two or more distinct personalities or personality states (each with its own relatively enduring pattern of perceiving, relating to, and thinking about the environment and self).

    B. At least two of these personalities or personality states recurrently take full control of the person's behavior.

---

[1] According to the *DSM-III-R*, at 269-70: The transition from one personality to another is usually sudden, but, rarely, may take hours or days. Personalities may have awareness of each other to varying degrees, or may be unaware of the existence of other personalities. "The individual personalities may be quite discrepant in attitude, behavior, and self-image, and may even represent opposites." The different personalities may have different physiologic characteristics and responses to psychological tests. "Different personalities may, for example, have different eyeglass prescriptions, different responses to the same medication, and different IQs." Onset of the disorder is "almost invariably in childhood", the disorder tends to be chronic, the degree of impairment may be mild to severe, and studies indicate that in nearly all cases the disorder was preceded by abuse (often sexual) or other severe emotional trauma in childhood. The disorder was once thought to be rare, but recent reports suggest it is not as rare as has been thought. The disorder is more frequently diagnosed in females than in males.

According to the parties' stipulated facts, the "host personality" is Dea Wheaton. An "alter personality", "Cassie", is described in the stipulated facts as "an angry and impulsive 'streetwise' alter who attempts to sabotage the host alter, DEA WHEATON." Stipulated fact 11; Clerk's Papers, at 99.

According to the stipulated facts, on September 20, 1990, defendant took money from an open cash register at a saloon, threatened and shoved an employee of the establishment, took the employee's driver's license, and in the course of things pulled a telephone out of the wall. After defendant left the business, the employee contacted police and gave them a description of defendant. Defendant was soon located, and the employee positively identified defendant as the person who took the money from the till. Cash and the driver's license were found on defendant's person.

Also according to stipulated facts, at the time . of the offense alter personality "Cassie" was in executive control of the physical body. Host personality Dea Wheaton was not conscious or in executive control of the physical body and has no independent knowledge of the acts constituting the offense.

Defendant was charged with second degree robbery. Subsequently, the State amended the information and characterized "Cassie" as an alias. On October 15, 1990, in her omnibus application defendant provided notice of a possible defense based upon MPD and incompetency to stand trial. Defendant moved for appointment of a sanity commission; the motion was granted. *See* RCW 10.77.060(1).

In a report from Western State Hospital, psychologist Dr. Gregg J. Gagliardi diagnosed MPD, but would "render no ultimate opinions" on the issue of sanity or diminished capacity "since in a case as complex as this the ultimate decision regarding guilt or level of culpability rests with the judge and jury." Clerk's Papers, at 31. Gagliardi elicited "Cassie" during an interview, and concluded that she was legally sane under *M'Naghten*'s test. *See* RCW 9A.12.010. Dr. Gagliardi said, however, that "the host personality appears to have been

entirely absent and at least psychologically uninvolved" at the time of the offense. Clerk's Papers, at 32.

Following receipt of Dr. Gagliardi's report, defendant filed notice of intent to rely upon an insanity defense, and moved for appointment of a forensic psychological expert to perform a sanity evaluation. In response, the court ordered a supplementary report from Western State Hospital asking for an opinion on the sanity question. Dr. Gagliardi responded that as was clear in his previous report, his opinions on sanity pertained only to the alter personality Cassie. He stated that he was

> unable to render further opinions regarding the remainder of the defendant's personality system, particularly the host personality [Dea Wheaton], because *there is simply no scientifically acceptable way to assess the mental state of alter personalities who were not co-conscious at the time of the crime.*

Clerk's Papers, at 35. Dr. Gagliardi also said that to offer an opinion about Dea Wheaton beyond that given in his earlier report would misrepresent the current state of clinical knowledge in his profession.

Defendant again moved for appointment of another expert. The State moved to suppress the mental health defense on the basis it did not meet the standard of *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923). The trial court then appointed psychiatrist Dr. Phillip G. Lindsay for the purpose of presenting testimony at a *Frye* hearing, and ultimately ruled that defendant had met the burden of establishing that psychiatric principles and clinical knowledge about MPD had gained general acceptance in the field of psychiatry and that a qualified expert witness could render an opinion regarding the sanity or insanity of a person suffering from the disorder.

The court then entered an order appointing Dr. Lindsay as an expert forensic psychiatric witness to evaluate defendant. Dr. Lindsay opined that Dea Wheaton has "a mental disorder that caused her to be unaware of the nature and quality of the act that was occurring, and that therefore she meets the fundamental elements of the M'Naghten test."

Clerk's Papers, at 70. Defendant then moved for judgment of acquittal on the basis of insanity. At the hearing on the motion, Dr. Lindsay stated that there are two approaches to the multiplicity issue, a "global" approach, and a "specific alter" approach. Under the latter, the insanity determination would be made by focusing on the alter personality in executive control at the time of the offense.

Following the hearing, the court denied defendant's motion and adopted a "specific alter" approach. With regard to whether alter personality Cassie was insane at the time of the offense, the court concluded there were conflicting facts which had to be resolved by the trier of fact.

The State filed a second amended information charging defendant with first degree theft rather than second degree robbery. The parties then submitted the case to the trial court on stipulated facts and the court entered a verdict of guilty. The trial court sentenced defendant, a first-time offender with a presumptive sentence of 0 to 90 days, to a program of community supervision for 24 months, 30 days' confinement with 29 days converted to community service and credit for 1 day served, with certain conditions, including no use of alcohol and continued treatment with a mental health professional who had been treating defendant for MPD, plus payment of $100 to the crime victims compensation fund.

Defendant appealed. The appeal was certified to this court by Division Two; certification was accepted.

The parties agree that defendant suffers from MPD. We will assume that the diagnosis is valid. In our discussion we also generally assume that MPD can involve distinct personalities, one or more of which may be unaware of the others and their conduct. However, we caution that the nature and ramifications of MPD are matters of disagreement in the medical/scientific community. *See generally* Saks, *Multiple Personality Disorder and Criminal Responsibility*, 25 U.C. Davis L. Rev. 383 (1992) (and articles cited therein). Indeed, although MPD is recognized in the *DSM-III-R*, some psy-

chiatrists are intensely skeptical, at least insofar as most reported cases are concerned, and believe that in most instances MPD is consciously simulated by those with an ulterior motive such as avoidance of criminal responsibility, or is unconsciously adopted in order to be more interesting or to please their therapists. Saks, 25 U.C. Davis L. Rev. at 400.

There was a *Frye* hearing in this case. The State has not sought review of the trial court's *Frye* ruling, and we do not address its propriety. We caution that our assumptions about MPD are thus only assumptions.

The specific defense which defendant asserts is new to the law, with only a handful of cases even addressing the issue of criminal liability of defendants claiming an insanity defense based upon MPD.[2] Thorough analysis of how medical opinions fit relevant legal concepts is called for. Fundamentally, the medical opinions about MPD must be adequate to permit a court to address the legal sanity/insanity inquiry, and specifically, in this case, to determine how to assess persons diagnosed with multiple personalities for insanity. Here we have opinions of two doctors, Dr. Lindsay, a psychiatrist, and Dr. Gagliardi, a psychologist. Both doctors' reports were considered by the trial court and are in the materials before us. Dr. Lindsay testified by telephone at the hearing on defendant's motion for judgment of acquittal

---

[2]Washington follows the *M'Naghten* test for insanity, codified at RCW 9A.12-.010:

To establish the defense of insanity, it must be shown that:

(1) At the time of the commission of the offense, as a result of mental disease or defect, the mind of the actor was affected to such an extent that:

(a) He was unable to perceive the nature and quality of the act with which he is charged; or

(b) He was unable to tell right from wrong with reference to the particular act charged.

*See M'Naghten's Case*, 10 Clark & Fin. 200, 8 Eng. Rep. 718 (H.L. 1843). The law presumes that a defendant is sane at the time an alleged offense was committed. *State v. Box*, 109 Wn.2d 320, 322, 745 P.2d 23 (1987). Insanity is an affirmative defense which defendant must prove by a preponderance of the evidence. RCW 9A.12.010(2); *see, e.g., Box*, at 322; *State v. Crenshaw*, 98 Wn.2d 789, 792, 659 P.2d 488 (1983).

by reason of insanity. Dr. Gagliardi did not testify. Neither doctor's opinion provides a sound basis for a decision by this court.

The trial court entered findings of fact upon defendant's motion for a judgment of acquittal by reason of insanity. The parties stipulated to facts for submission to the trial court for a verdict after the court had denied defendant's motion for judgment of acquittal. We have gone behind the findings of fact and stipulated facts even though there is no assignment of error to any of them. We have done this not to discover or address error not raised by the parties, but rather to verify whether this record is sufficient to sustain a decision on the merits. As evident by our discussion below, the findings and stipulated facts and the record in its entirety are inadequate for a reasoned decision. Moreover, the record reveals that the findings of fact and stipulated facts misrepresent the medical evidence.

The findings of fact and the stipulated facts are virtually the same insofar as MPD and the doctors' opinions about defendant's sanity are concerned. One finding of fact, which is not reflected in the stipulated facts, concerns Dr. Lindsay's view of possible approaches to the issue:

> DR. LINDSAY indicates that there are two possible approaches for determining whether a defendant who suffers from Multiple Personality Disorder should be held accountable for the physical body's criminal acts: "global" and "specific alter." DR. LINDSAY believes that the correct and therapeutic focus is the global approach which would result in a finding of insanity whenever the host personality is not in executive control or co-conscious at the time of the offense. The specific alter approach focuses on whether the alter that was in executive control at the time of the offense meets the M'Naghten standard.

Finding of fact 3; Clerk's Papers, at 90.

■ Initially, insofar as Dr. Lindsay's testimony may be construed as defining two possible legal standards for assessing the sanity of a criminal defendant diagnosed as suffering from MPD, that testimony encroaches on the responsibility and authority of the courts to decide such legal matters. As the court has recognized, criminal responsibility is a legal,

rather than a medical or scientific problem, and, in a larger sense, it is a social question. *State v. White*, 60 Wn.2d 551, 585, 374 P.2d 942 (1962) (quoting *Blocker v. United States*, 288 F.2d 853, 866 (D.C. Cir. 1961) (Burger, J., concurring)), *cert. denied*, 375 U.S. 883 (1963).

Insofar as Dr. Lindsay's testimony relates to the disorder and how it affects individuals suffering from it, and how this may be related to a determination of sanity or insanity under the *M'Naghten* standard, it may be accepted as the kind of medical/scientific testimony which can assist a court in deciding the legal issue.

. As stated, Dr. Gagliardi refused to give any opinion about how to approach the question of multiplicity as it relates to the *M'Naghten* standard, on the basis that "there is simply no scientifically acceptable way to assess the mental state of alter personalities who were not co-conscious at the time of the crime." (Italics omitted.) Clerk's Papers, at 35. Thus, Dr. Lindsay's view is the only source in this record of any medical opinion as to how multiplicity might affect the determination of legal sanity or insanity under the *M'Naghten* test, RCW 9A.12.010.

However, Dr. Lindsay's own testimony establishes that a "global" approach, which he favors, is, on this record, not an accepted approach:

Q: Are you aware of any articles or where a state has adopted your global perspective?
A: [Dr. Lindsay] I have not seen any as yet. But just from both a forensic and a clinical perspective, it makes more sense to me because I don't think you can really understand either the illness or the nature of any act of a given alter if you don't understand the big picture, the whole situational context in which it is occurring.

Verbatim Report of Proceedings, at 39.

As this exchange reveals, Dr. Lindsay was unaware of *any* literature espousing his view.

As noted, there was a *Frye* hearing. The trial court appointed psychiatrist Dr. Lindsay for the purpose of presenting testimony at the hearing. There is no transcript of the *Frye* hearing before us. However, the same Dr. Lindsay who testified and apparently convinced the trial court that an

expert could render an opinion about the sanity or insanity of someone suffering from MPD expressly stated in testimony which is before this court that he was unaware of any literature (or any state) accepting the "global" approach as the proper approach.

We do not decide any *Frye* issue in this case. We do not have the record to assess it, nor is it an issue raised by the State. However, despite the fact a *Frye* hearing was held and the trial court's ruling on the *Frye* issue is unchallenged, the fact of an unreported *Frye* hearing does not erase questions about the propriety of adopting a particular approach for assessing the sanity of a criminal defendant diagnosed as suffering from MPD. This is especially so where the only expert who gave an opinion on the matter advocates an approach which, to his knowledge, has never been accepted in any literature or by any state.

Our uneasiness about deciding the legal issue in this case is exacerbated by the transcript of testimony at the hearing on the defense motion for acquittal. For example, the following gives some flavor of the testimony:

Q: [Defense Counsel] Dr. Lindsay, the specific situation that I think is of interest to myself and the Court in this case is where the host personality is not co-conscious and has no psychological complicity in the commission of a criminal act, does MPD, as understood in the field of psychiatry today, consider that person to be criminally responsible for their acts?

[Deputy Prosecutor] Objection again, calls for a legal conclusion.

THE COURT: Understand. Overruled.

A: [Dr. Lindsay] I think that it would be fair to say that in those situations that you have just described, the hypothetical that you just have said, that in those circumstances, one would generally view — I certainly view and I think others that I know who work in this area generally view — that situation as one in which the elements of the insanity defense are met, that is, there isn't — there — because of a mental disorder, that there isn't a knowledge of the nature and quality of the act that was being committed or that there wasn't a moral sense that what was being done was wrong or illegal or whatever.

Verbatim Report of Proceedings, at 27-28.

Also as to Dr. Lindsay, we are not properly informed about his qualifications regarding expertise about MPD. We carefully note that there is no objection to his qualifications, and in fact the verbatim report of proceedings indicates the State stipulated to his qualifications as an expert when he testified by telephone at the hearing on defendant's motion for judgment of acquittal by reason of insanity. However, we are not concerned solely with an expert opinion about this defendant's sanity or insanity. We are concerned with what should be the rule of law for determining how to assess the legal sanity or insanity of a criminal defendant basing an insanity defense on MPD. How should one approach the question of multiplicity? The answer to the question affects not just this case, but any future case where the issue arises. It is important that the rule of law be soundly based. Aside from the lack of any support for Dr. Lindsay's opinion that a "global" approach is preferred, we note that the only information we have about Dr. Lindsay's qualifications is contained in defense counsel's hearsay affidavit, Clerk's Papers, at 46, which we will not accept.

The other expert witness, Dr. Gagliardi, refused to render an ultimate opinion on Dea Wheaton's sanity or insanity, saying that to do so would misrepresent the current state of clinical knowledge in his profession. This part of his opinion is not, however, reflected in the trial court's findings of fact. Finding of fact 6, Clerk's Papers, at 91-92, contains only Dr. Gagliardi's medical opinion that alter personality Cassie was sane under the *M'Naghten* standard.

We acknowledge that MPD is recognized in *DSM-III-R*, but the bare 3½ pages of text there do not answer the many legal questions involved. As we indicated at the outset of this discussion, there are varying views of the disorder and its ramifications. As a result of our perusal of some of the literature in this area, we are unprepared to accept the conclusion that there are only two possible approaches to the issue. There may well be other theories which should be considered, but none are brought to our attention by the parties.

We conclude this record simply does not contain enough soundly based information about MPD, its nature and ramifications, for this court to announce a rule of law for determining how to assess the legal sanity or insanity of a defendant suffering from MPD.

However, the adequacy of the record is not the only reason we refuse to reach the legal merits of the issue. The legal argument and authority presented by the parties are insufficient for a decision. In this regard we first address the trial court's conclusion of law 2 upon defendant's motion for judgment of acquittal by reason of insanity. In that conclusion, prepared and presented by the State, the trial court concluded:

> That three appellate courts have addressed the issue of whether the existence of Multiple Personality Disorder is grounds for excusing a defendant's criminal behavior. *See State v. Rodrigues*, 67 Haw. 70, 679 P.2d 615[, *cert denied*, 469 U.S. 1078] (1984); *Kirkland v. State*, 166 Ga. App. 478, 304 S.E.2d 561 (1983); *State v. Grimsley*, 3 Ohio App. 3d 265, 444 N.E.2d 1071 (1982). All three appellate courts have rejected DR. LINDSAY'S "global" approach, and have adopted the "specific alter" approach. That although these three non-Washington appellate decisions are not binding upon this court, this court finds them persuasive and specifically adopts the reasoning of *State v. Rodrigues, supra*.

Conclusion of law 2; Clerk's Papers, at 92. The same cases are relied upon by the State in its brief.

The conclusion of law assumes the issue to be as defined by Dr. Lindsay, a "global" approach (for which he admits he is unaware of any support), or a "specific alter" approach, which the conclusion states has been followed by the three cited cases.

However, the out-of-state cases are not consistent in their analysis. Moreover, although the conclusion states the court "adopts" the reasoning in *State v. Rodrigues*, 67 Hawaii 70, 679 P.2d 615, *cert. denied*, 469 U.S. 1078 (1984), it does not state what the rule adopted is. Further, *Rodrigues* appears internally inconsistent.

In *Rodrigues*, the court held: "Since each personality may or may not be criminally responsible for its acts, each one

must be examined under the American Law Institute . . . competency test [Hawaii's test for insanity]." *Rodrigues*, at 73. The court concluded that in light of conflicting expert testimony, resolution of the sanity issue was for the jury and the trial court erred in granting defendant's motion for judgment of acquittal.

The court's holding states that the sanity of *each personality* should be examined. Unfortunately, the court does not explain what should happen as a result of that assessment. The court then confuses its holding by stating that the question is "for the jury where, as here, there are divers[e] opinions as to which personality performed the acts and *whether that personality was sane or not*." (Italics ours.) *Rodrigues*, at 77. Thus, *Rodrigues* states that (1) all of the personalities are to be assessed for insanity, but then suggests (2) the sanity of the personality performing the acts is the critical question. This apparent inconsistency is noted in Saks, *Multiple Personality Disorder and Criminal Responsibility*, 25 U.C. Davis L. Rev. 383, 386 n.8, 387 n.10 (1992).

While the trial court here purported to adopt the reasoning in *Rodrigues*, that reasoning and its application are unclear.

In *State v. Grimsley*, 3 Ohio App. 3d 265, 444 N.E.2d 1071 (1982), the court analyzed the question of criminal liability in two very different ways. First, it examined a claimed defense of unconsciousness in light of an Ohio statute setting forth the requirements for a criminal offense: a voluntary act or omission and mental culpability. *See Grimsley*, at 268. The court separately addressed a claim of insanity. *Grimsley*, at 269. The court concluded that as a matter of unconsciousness as a defense, the host's lack of consciousness does not relieve the defendant of criminal liability if the alter was conscious and acted volitionally. In contrast, as a matter of an insanity inquiry, the court said that the evidence in the case failed to establish legal insanity of the host, the alter, or both. Thus, the court did not have to decide how to assess the sanity of defendant because whether the focus was the host, the alter, or both, the evidence in the case, in the court's view, did not establish insanity.

In *Kirkland v. State*, 166 Ga. App. 478, 304 S.E.2d 561 (1983), defendant pleaded not guilty by reason of insanity due to MPD (diagnosed as psychogenic fugue). The trial court rejected the insanity defense, instead finding defendant "guilty but mentally ill". *Kirkland*, at 479. Defendant appealed, arguing that the trial court erred in not finding defendant insane in the face of uncontroverted expert testimony.

The Georgia Court of Appeals stated: "The law adjudges criminal liability of the person according to the person's state of mind at the time of the act; we will not begin to parcel criminal accountability out among the various inhabitants of the mind." *Kirkland*, at 480. Then the court quoted from *Grimsley* where the court said that it is immaterial whether the defendant was in one state of consciousness or another, so long as the personality in control is conscious and her actions volitional. *Kirkland*, at 480 (quoting *Grimsley*, at 268). However, this is the part of *Grimsley* which relates to *unconsciousness as a defense* vis-a-vis mental intent and volitional actions, not the part discussing insanity as a defense.

The court in *Kirkland* then reasoned that if at the time of the criminal act the person did not meet Georgia's test for insanity, "the law will not inquire whether the individual possesses other personalities, fugues, or even moods in which he would not have performed the act or perhaps did not even know the act was being performed." *Kirkland*, at 481. This part of the court's reasoning clearly focuses on the alter in control at the time of the criminal acts, but does not explain *why* that alter should be the focus.

The State relies upon these three cases in its brief. The cited cases do not convince this court to hold, as a matter of law, especially given this record, that focus on the alter in control at the time of the offense is appropriate.

However, defendant also fails to cite any authority which would be helpful. In the discussion of law in defendant's brief, consisting of only 5½ pages, defendant relies upon *State v. Utter*, 4 Wn. App. 137, 141, 479 P.2d 946 (1971), for the principle that one who is unconscious at the time of the

act is not responsible for his or her criminal acts. Defendant's argument is that because Dea Wheaton was unconscious at the time of the offense, she was unable to perceive the nature and the quality of the act with which she is charged.

However, *Utter* does not help in resolving the question how to assess a defendant suffering from MPD for insanity. It is not enough to say that Dea Wheaton was unconscious at the time of the offense. That would matter if the focus should be on the personality Dea Wheaton. If the focus here should be on the alter in executive control, as the trial court concluded, the question would be whether Cassie was conscious at the time of the offense. Thus, the fact that Dea Wheaton was not conscious does not help resolve the underlying question, *i.e.*, is it proper to focus on the alter personality?

Defendant also relies upon cases holding that "one who believes that he [or she] is acting under the direct command of God is no less insane because he [or she] nevertheless knows [the act] is prohibited by the laws of man." *State v. Cameron*, 100 Wn.2d 520, 526-27, 674 P.2d 650 (1983); *see State v. Rice*, 110 Wn.2d 577, 604-05, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989). Defendant analogizes the circumstances here to those cases. We are not convinced by the analogy.

First, the deific decree cases involve a "narrow exception to the societal standard of moral wrong". *Cameron*, at 526 (quoting *State v. Crenshaw*, 98 Wn.2d 789, 798, 659 P.2d 488 (1983)).

Further, the analogy is without support in this record. Defendant's brief states that "[i]f we accept the proposition" that in the case of a deific decree and MPD "the entities responsible for the acts were products of the accused's imaginations" then the cases are not distinguishable. Brief of Appellant, at 10. The record does not support the view that alter personalities are "imaginary personalities".[3] Defendant's argument, on this record, is based upon a premise

---

[3] Nor are we convinced defendant has accurately characterized the deific decree cases.

without foundation. (Nor does the *DSM-III-R* characterize the disorder in such a fashion. In fact, the personalities are regarded as "distinct personalities or personality states (each with its own relatively enduring pattern of perceiving, relating to, and thinking about the environment and self)" which "recurrently take full control of the person's behavior." *DSM-III-R*, at 272.)

Defendant does not cite any relevant literature. While case law may be sparse, there is a significant body of literature discussing MPD and criminal liability. *See, e.g.*, Saks, *Multiple Personality Disorder and Criminal Responsibility*, 25 U.C. Davis L. Rev. 383 (1992); Howe, *Psychiatric Evaluation of Offenders Who Commit Crimes While Experiencing Dissociative States*, 8 L. & Hum. Behav. 253, 255 (1984); Savitz, *The Legal Defense of Persons With the Diagnosis of Multiple Personality Disorder*, 3 Dissociation 195, 201-02 (Dec. 1990); Perr, *Crime and Multiple Personality Disorder: A Case History and Discussion*, 19 Bull. Am. Acad. Psychiatry & L. 203, 214 (1991). (There is an even greater body of literature in the medical field; for a considerable listing of such, see articles cited in Saks, *supra*.)

The only literature the State cites in its 7-page discussion of law is a 1955 law review article quoted in a case cited by the State.

In short, the argument and authority in the briefing are inadequate to decide the significant question raised by defendant.

Finally, there are other problems with this case as presented for this court's review. Defendant claims that the dispute which the trial court resolved in this case was whether to focus on the sanity of the host personality at the time of the offense or to focus on the sanity of the alter personality who was conscious at the time of the offense. Defendant contends this characterization of the issue is analytically unsound as it ignores the disorder from which defendant suffers, MPD.

However, finding of fact 3 reflects Dr. Lindsay's testimony:

Q: Okay. Assuming that you would be able to determine the sanity or insanity of an alter who is not co-conscious with

the host at the time of an alleged criminal act, is that the correct focus when determining the sanity of a victim of multiple personality disorder?

. . . .

A: . . . I think one can look at it from two points of view, one can look at it from the more global perspective that an individual has a disorder which may, in this case multiple personality, which may, in not one but several different alters, render them incapable of moral judgment that would prevent a criminal act. One can look at it from, in other words, the illness perspective or one can look at it from a specific alter perspective. Either way, I think one may come to the same conclusion, that either from the illness or given a specific alter, the specific criminal act occurred, which is the basis for the judgment about the insanity defense. I think either would be an appropriate one.

Verbatim Report of Proceedings, at 23.

Defendant is wrong in stating that the issue framed below was whether to focus on the sanity of the host personality or the sanity of the personality of the alter in control at the time of the offense. The "global" approach advocated by Dr. Lindsay accords with the approach which defendant now claims is correct. However, as indicated, we will not adopt a rule of law based solely on Dr. Lindsay's opinion that the "global" approach is correct.

Next, the trial court's conclusion of law 3 upon defendant's motion for judgment of acquittal by reason of insanity is erroneous. The trial court concluded that "the question of sanity is one of fact, and should go to the jury when, as here, there is conflicting evidence on the issue." Conclusion of law 3; Clerk's Papers, at 92. The trial court erred when it said that the question of sanity should go to the jury when there is conflicting evidence on the issue. This court has held that upon a motion for judgment of acquittal by reason of insanity "[t]he trial court must weigh the evidence and acquit if the evidence preponderates in favor of the defendant." *State v. Sommerville*, 111 Wn.2d 524, 531, 760 P.2d 932 (1988) (overruling in part *State v. McDonald*, 89 Wn.2d 256, 571 P.2d 930 (1977)). The court rejected a conflict-in-the-evidence standard. *Sommerville*, at 530. Of course, it is apparent that neither of the parties informed the court about the holding in

*Sommerville* and, as noted, the conclusions of law were prepared and presented by the State. We note that no party has complained about this conclusion of law, but it is representative of the case presented to this court.

██ We also comment upon the parties' stipulated facts. Stipulating to facts is appropriate in many instances, and can efficiently define a case for resolution by a court. However, it is fundamental that stipulated facts must include those essential facts necessary to permit a reasoned and informed analysis by the court. If parties stipulate to facts at trial, those facts must be sufficient for a sound legal decision. Further, the stipulated facts must be sufficient for appellate review of issues arising from the decision on the stipulated facts. *See generally Pearce Co. v. Riley,* 23 Wn.2d 97, 98, 160 P.2d 506 (1945) ("[t]he superior court heard the matter upon stipulated facts, and we, of course, review its decision on the same stipulation"); *cf.* RAP 9.4 (concerning agreed report of proceedings for appellate review); *Hammel v. Rife,* 37 Wn. App. 577, 682 P.2d 949 (court confined review to agreed report of proceedings, finding them lacking clarity but setting forth sufficient facts for review), *review denied,* 102 Wn.2d 1007 (1984).

At the point the parties stipulated to the facts, the trial court had already ruled that the focus should be on the sanity or insanity of the alter personality in control at the time of the offense, *i.e.,* what was termed the "specific alter" approach. Thus, the findings at that point had to accurately and sufficiently inform the court of the facts needed for a sound decision about guilt.

The stipulated facts about MPD and defendant's sanity comprise only four paragraphs. Those four paragraphs echo the trial court's findings of fact upon defendant's motion for a judgment of acquittal on the basis of insanity. Although the stipulated facts do not include a duplication of finding of fact 3, regarding possible approaches to the multiplicity issue, like the findings of fact they do not fully reflect the medical testimony, nor do they provide sufficient information for a reasoned decision in this case. We recognize that

this criticism extends perhaps more to the findings, which formed the basis for the trial court's holding on the legal issue raised by defendant, but the stipulated facts are necessarily flawed for the same reason that the findings are.

The stipulated facts also contain at least one misleading factual statement, which, taken at face value, a court would be bound to disregard. That is, in stipulated fact 11, Clerk's Papers, at 99, it is stated: "DR. LINDSAY has not interviewed or examined "CASSIE" since the September 20, 1990, robbery, but he opines to a reasonable medical certainty that "CASSIE'S" anger and impulsiveness meets the M'Naghten test for insanity at the time of the robbery."

At one point in his testimony, Dr. Lindsay said about alter personality Cassie that

> she is so angry and impulsive that it's likely, more probable than not, that she isn't able to really discriminate the difference between right and wrong. Her impulsivity I think robs her of that ability because she doesn't act on a rational or planned basis but reacts rather to impulse and feeling, and, therefore, right and wrong are not so much the considerations as would be considerations of just expressing herself, her feelings and her impulses.

Verbatim Report of Proceedings, at 35. The prosecuting attorney then stated that it seemed that Dr. Lindsay was saying that Cassie had an irresistible impulse to do wrong, which did not satisfy the *M'Naghten* test, and asked the doctor to clarify how he viewed Cassie with regard to *M'Naghten*'s test.

Dr. Lindsay clarified that some alters are antisocial,

> [t]hey tend to have little awareness of the rightness or wrongness or moral quality of any given action and a great deal of sensitivity to their own feelings and impulses. I think Cassie is one such individual, and as such, both the perspective as a whole, looking at the whole individual, and the perspective of looking at it from Cassie's direction, would lead one to conclude, as I have, that [Cassie] did not know the nature and quality of the act that she was doing.

Verbatim Report of Proceedings, at 37.

Insofar as the stipulated finding states only that Dr. Lindsay opined that Cassie's "anger and impulsiveness meets the M'Naghten test for insanity" it does not accurately reflect all of Lindsay's testimony, although we agree that the doctor's initial formulation of his opinion on insanity did not conform to the *M'Naghten* standard. Moreover, no court could validly find "Cassie" insane based upon the stipulated fact, as anger and impulsiveness do not satisfy the *M'Naghten* standard. It is remarkable that the parties stipulated to the fact as set out in the written stipulation.

We note defendant's citations to the inadequate record are erroneous and confusing.[4]

■ Our affirmance of the trial court is premised upon an inadequate record and inadequate argument to permit review of the issue. We do not pass on the merits of the issue raised. The issue which defendant has attempted to raise must await another day. We do not foreclose the possibility that in another case sufficient information and argument may be presented which will permit a reasoned analysis of the issue which defendant has sought to have reviewed in this case.

Affirmed.

ANDERSEN, C.J., and UTTER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.

---

[4]For example, Brief of Appellant, at 1, cites Clerk's Papers, at 77-79 for the stipulated facts. The cited pages are in fact the last page of Dr. Gagliardi's second report, and two pages of his first report. Defendant cites Clerk's Papers, at 7-8 for the motion for appointment of a sanity commission, Brief of Appellant, at 2; the cited pages are the last two pages of defendant's omnibus application. Defendant cites Clerk's Papers, at 19-23 as the motion for appointment of a forensic psychological expert to perform a sanity evaluation, Brief of Appellant, at 2; the cited pages are the last two pages of defendant's amended omnibus application plus some of the pages of the stated motion and affidavit. It is unnecessary to list all the errors; they are legion.